828 F.2d 718
 Robert S. CROWDER, Julia J. Crowder and Henry C. Cooper,
Plaintiffs-Appellants,
H. Allan McCartney, Intervenor,
v.
SOUTHERN BAPTIST CONVENTION and Executive Committee of the
Southern Baptist Convention, Defendants-Appellees.
 No. 86-8386.
 United States Court of Appeals, Eleventh Circuit.
 Sept. 28, 1987.
 
 Jane F. Vehko, Atlanta, Ga., for plaintiffs-appellants.
 James P. Guenther, Guenther & Jordan, Nashville, Tenn., Perry E. Pearce, King & Spalding, Griffin B. Bell, Richard A. Schneider, J. Warren Ott, Atlanta, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before KRAVITCH and EDMONDSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 Among the separation of church and state principles required by the establishment and free exercise clauses of the first amendment is that courts may not adjudicate ecclesiastical disputes. In this case, we examine the contours of this prohibition in deciding whether the district court erred in concluding that it could not, consistent with the first amendment, adjudicate a dispute concerning a parliamentary ruling at the 1985 Southern Baptist Convention.
 
 
 2
 * In June 1985, more than 45,000 baptists who had been elected as "messengers" by their local congregations converged in Dallas, Texas, for the 1985 Southern Baptist Convention[1] (1985 Convention). Among the business at the 1985 Convention was the election of members to the Committee on Boards, Commissions, and Standing Committees (Committee on Boards); the body responsible for nominating members to the various Southern Baptist Covention (SBC) institutions that administer the SBC's assets and annual budget.
 
 
 3
 In accordance with SBC bylaws,[2] the SBC Committee on Committees submitted a slate of nominations for the Committee on Boards for consideration by the floor of the 1985 Convention. When SBC President and 1985 Convention Chairman Dr. Charles Stanley opened the floor for discussion of the nominations, Messenger Slatton moved to "amend" the Committee on Committees' slate of nominations by substituting a new slate of candidates. Chairman Stanley ruled that Messenger Slatton could not offer an entire slate of candidates at once and that he would have to move to amend the Committee's nominations one by one by referring to specific individuals. When he realized that this ruling would greatly impair his ability to present the reasons supporting the substitution of a new slate of candidates,[3] Messenger Slatton appealed the chair's ruling to the floor of the convention. The messengers voted to overrule the chair and allow the floor to vote for all of Messenger Slatton's nominees at one time. The 1985 Convention then adjourned until the evening session.
 
 
 4
 When the evening session convened, Chairman Stanley ruled that Messenger Slatton's motion was out of order because SBC bylaw sixteen states that members to the Committee on Boards "shall be nominated to the Convention by the Committee on Committees." The 1985 Convention parliamentarian explained that this bylaw does not permit any motion from the floor of the convention to amend the list of nominations received from the Committee on Committees because the word "shall" indicates that the Committee on Committees is exclusively responsible for such nominations. Chairman Stanley then refused to recognize several messengers attempting to raise points of order, and called for a vote on the Committee on Committees' nominations. The nominations were approved by a majority of messengers.
 
 
 5
 Appellants Robert S. Crowder, Sr., Julia J. Crowder, H. Allan McCartney and Henry C. Cooper were duly certified and registered messengers to the 1985 Convention. Appellants Robert and Julia Crowder petitioned the SBC Executive Committee both in writing and in person through counsel to urge the Executive Committee to use its "ad interim" authority[4] to correct Chairman Stanley's allegedly erroneous rulings and to take appropriate action with respect to the Committee on Boards. The Executive Committee considered appellants' petition and affirmed the election of the Committee on Boards because "[w]hatever mistakes might have occurred in Dallas with reference to interpretation of the bylaws is history. To seek to re-do or un-do an action of the Southern Baptist Convention will accomplish no positive good." The Executive Committee adopted the recommendations of the Executive Committee Bylaws Workgroup indicating, inter alia: (1) that messengers control the SBC within the SBC's procedures; (2) that the messengers at the 1985 Convention elected the nominees of the Committee on Committees; (3) that the Committee on Committee's nominees for the Committee on Boards would, in the opinion of the Executive Committee, have been elected even if the nominees offered from the floor had been voted upon; (4) that messengers to the 1986 Convention will have an opportunity to erase any influence of the Committee on Boards elected at the 1985 Convention by rejecting the committee's nominations from the floor of the 1986 Convention; and (5) that the polity of the SBC gives the Executive Committee the power to render moot any procedural defects in the election of the Committee on Boards at the 1985 Convention by affirming the election.[5]
 
 
 6
 The Crowder appellants and appellant Cooper then brought this diversity action against appellees,[6] the Southern Baptist Convention and the Executive Committee of the Southern Baptist Convention. Appellants sought a declaration as to the proper construction of the bylaws in question;[7] a declaration that Chairman Stanley's rulings were invalid;[8] and a declaration that the members of the Committee on Boards selected at the 1985 Convention were without authority to serve in that capacity.[9] In addition, appellants sought to enjoin appellees from violating the declaratory judgments and from permitting the members of the Committee on Boards elected at the 1985 Convention from serving in that capacity.
 
 
 7
 Appellees filed a motion to dismiss alleging that the federal court lacked jurisdiction due to insufficiency of the amount in controversy, 28 U.S.C. Sec. 1332(a), and that the court's exercise of jurisdiction over the controversy would violate the First Amendment.[10] The district court converted appellees' motion to dismiss into a motion for summary judgment because appellees relied upon matters outside of the pleadings, see Fed.R.Civ.P. 12(b); it denied appellees' motion for a stay of proceedings because the amount in controversy and first amendment issues were intertwined with the merits. Appellants then moved for summary judgment and responded to appellees' motion for summary judgment.
 
 
 8
 The district court granted summary judgment for appellees on first amendment grounds and denied all other pending motions as moot. The court reasoned that the preliminary consideration in determining whether judicial resolution of the controversy would violate the fundamental proposition of constitutional law that civil tribunals have no power to resolve disputes which are ecclesiastical in nature is to determine the exact nature of the dispute. Only then may a court decide whether the case may be resolved by resort to the "neutral principles of law" method described in Jones v. Wolf, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). Applying this analysis, the court concluded that "[w]hether Reverend Dr. Stanley's rulings were correct or patently incorrect is irrelevant because a decision as to validity of his rulings would involve this court in the internal affairs of the Southern Baptist Convention, a position the court cannot assume."
 
 II
 
 9
 The prohibition on judicial cognizance of ecclesiastical disputes is founded upon both establishment and free exercise clause concerns. By adjudicating religious disputes, civil courts risk affecting associational conduct and thereby chilling the free exercise of religious beliefs. Moreover, by entering into a religious controversy and putting the enforcement power of the state behind a particular religious faction, a civil court risks "establishing" a religion. The Supreme Court described the interplay of these establishment and free exercise concerns in School Dist. of Abington Township v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963):
 
 
 10
 The wholesome [government] "neutrality" of which this Court's cases speak ... stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits. And a further reason for neutrality is found in the Free Exercise Clause, which recognizes ... the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state. This the Free Exercise Clause guarantees.
 
 
 11
 Nevertheless, the Court has also rejected an absolute rule that civil courts are powerless to resolve any church property dispute. Bouldin v. Alexander, 82 U.S. (15 Wall.) 131, 21 L.Ed. 69 (1872); Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); Jones v. Wolf, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). Thus, Supreme Court decisions have attempted to strike an appropriate balance between the establishment and free exercise concerns implicated when a court is asked to resolve an ecclesiastical dispute, and the interests of the state and the aggrieved party in resolution of the controversy by a court of law. A review of the Court's decisions articulating the factors to be considered in achieving this balance is therefore necessary to the resolution of this case.
 
 
 12
 The Court has recognized two primary first amendment interests that favor judicial noninvolvement in an ecclesiastical dispute. The first of these first amendment concerns is the extent to which judicial resolution of the particular controversy would involve deciding issues of religious doctrine or beliefs. In Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872), for example, the Court found that the first amendment barred judicial resolution of a controversy over which of two factions within the church should be recognized as the "true" Walnut Street Presbyterian Church of Louisville. The Court reasoned that, although courts could resolve certain types of property disputes and set aside any punishment for crimes imposed by ecclesiastical tribunals:
 
 
 13
 [I]t is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character--a matter over which civil courts exercise no jurisdiction--a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them--becomes the subject of [an] action.... [I]t is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court.
 
 
 14
 Id. at 733, 20 L.Ed. 666.
 
 
 15
 Subsequent decisions have refined this analysis by identifying methods by which courts might resolve church property disputes without deciding questions of religious belief or doctrine. The Court's decisions in Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (Hull Church ), and Jones v. Wolf, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), recognized that where the method of resolution of the controversy avoids excessively entangling[11] the judiciary in questions of ecclesiastical doctrine or belief, the first amendment might permit a court to adjudicate the matter.
 
 
 16
 Hull Church concerned a dispute between the Presbyterian Church in the United States (general church) and two local churches over control of the properties used by the local churches. The local churches had renounced the general church's jurisdiction and authority over them because they believed that the general church had violated its own constitution and had departed from its doctrine in force at the time the local churches became affiliated with the general church. Georgia law at the time implied a trust in favor of the general church as long as the general church's actions did not "amount to a fundamental or substantial abandonment of the original tenets and doctrines of the [general church], so that the new tenets and doctrines are utterly variant from the purposes for which the [general church] was founded." Hull Church, 393 U.S. at 443-44, 89 S.Ct. at 603. The Georgia courts therefore enjoined the general church from asserting a right to the local church property because a jury found that the implied trust had terminated due to the general church's departure from its doctrine.
 
 
 17
 The Supreme Court held that Georgia's "departure-from-doctrine" analysis violated the first amendment because it required judicial resolution of matters of religious belief and doctrine. The Court indicated that:
 
 
 18
 [T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.... the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.
 
 
 19
 Id. at 449, 89 S.Ct. at 606.
 
 
 20
 In response to Hull Church's invalidation of the "departure-from-doctrine" method of resolving church property disputes, Georgia courts adopted a "neutral principles of law" approach[12] that the Hull Church Court, in the passage quoted above, suggested might be valid. The Supreme Court expressly approved of this new method in Jones v. Wolf, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979),[13] where the Court found that the neutral principles approach was not "wholly free of difficulty," but that "[o]n balance ... the promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application." Id. at 604, 99 S.Ct. at 3026. The Jones majority rejected the view of four dissenting justices that civil courts must defer to authoritative resolution of property disputes within the church itself in order to avoid either: reviewing and revising church decisions on matters of religious doctrine and practice; or interfering indirectly with the religious governance of those who have formed the association and submitted themselves to its authority. See id. at 618, 99 S.Ct. at 3033 (Powell, J., dissenting). Justice Blackmun's opinion for the Court reasoned that resolving church property disputes by a rule of compulsory deference to religious authority would create a greater risk of excessive government entanglement in religious affairs than would application of the "neutral principles of law" method:
 
 
 21
 Under [the dissent's] approach ... civil courts would always be required to examine the polity and administration of a church to determine which unit of [church] government has ultimate control over church property. In some cases, this task would not prove to be difficult. But in others, the locus of control would be ambiguous.... In such cases, the suggested rule would appear to require "a searching and therefore impermissible inquiry into church polity."
 
 
 22
 Id., at 605, 99 S.Ct. at 3026 (quoting Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 723, 96 S.Ct. 2372, 2387, 49 L.Ed.2d 151 (1976)).[14]
 
 
 23
 The Jones majority thus recognized and reaffirmed the importance of the second major first amendment interest favoring judicial noninvolvement in a religious dispute: that where religious organizations establish rules for their internal discipline and governance, and tribunals for adjudicating disputes over these matters, "the Constitution requires that civil courts accept their decisions as binding upon them." Milivojevich, 426 U.S. at 725, 96 S.Ct. at 2387-88. The disagreement between the justices in Jones reflects differing assessments of the extent to which resolution of the property dispute at issue in that case by adherence to this principle might involve a greater intrusion into religious affairs than would resolution by the "neutral principles of law" method.
 
 
 24
 The rule of deference to decisions of ecclesiastical bodies on matters of internal church governance was articulated in Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), where Justice Brandeis wrote for the Court that "because the appointment [to the chaplaincy] is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." Id. at 16, 50 S.Ct. at 7. Justice Brandeis concluded that "[i]n the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." Id. at 16, 50 S.Ct. at 7-8.
 
 
 25
 Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952), and Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), made it clear that the principle of deference to decisions of church authorities applies to disputes concerning matters of internal church governance. In Kedroff, the Court held that a state may not dictate which of two factions within the Russian Orthodox Church has the power to appoint the ruling hierarchy for the Russian Orthodox churches in America. The Court found that state legislation regulating matters of "church administration, the operation of the churches, [and] the appointment of clergy, by requiring conformity to church statutes adopted at a general [church] convention," was contrary to the first amendment because, in the absence of fraud, collusion, or arbitrariness,[15] matters of church governance are for the church to decide free from state interference.[16] Id. 107-08, 116, 73 S.Ct. at 150, 154.
 
 
 26
 In Milivojevich, the Court further limited the "marginal civil court review" endorsed in Gonzalez[17] by overruling Gonzalez to the extent that it allowed civil courts to decide whether the decision of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations and was therefore not "arbitrary." Milivojevich, 426 U.S. at 713, 96 S.Ct. at 2382. The Court found that such "arbitrariness" review is inconsistent with the "general rule" that "religious controversies are not the proper subject of civil court inquiry," and that "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law."[18] Id. Thus, the Court concluded that civil courts may not decide, consistent with the first amendment, whether the church complied with the procedural rules contained in the church constitution and penal code in defrocking one of its bishops. Similarly, the Court held that civil courts may not use the guise of the "neutral principles" approach to delve into issues concerning whether the general church acted beyond its authority under the church constitution in declaring a reorganization of the diocese. Id. at 721-24, 96 S.Ct. at 2386-87.
 
 
 27
 Balanced against these two first amendment considerations favoring civil court noninvolvement are the state interests in resolving disputes concerning rights to property and the individual interests in adjudicating before a civil court forum. Even where church property is involved, the state has a strong interest in rapid resolution of disputes concerning ownership rights to property. See, e.g., Jones v. Wolf, 443 U.S. 595, 602, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979) ("The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively"); Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 445, 89 S.Ct. 601, 604, 21 L.Ed.2d 658 (1969) ("It is of course true that the State has a legitimate interest in resolving property disputes, and that a civil court is a proper forum for that resolution."); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church, 344 U.S. 94, 120, 73 S.Ct. 143, 156-57, 97 L.Ed. 120 (1952) ("There are occasions when civil courts must draw lines between the responsibilities of church and state for the disposition and use of property."). The Jones Court's refusal to adopt a rule of compulsory deference to authoritative decisions of church bodies was grounded at least in part upon the fact: (1) that the state ultimately must determine who has the rights to the property; and (2) that doing so by deference to church tribunals would be difficult in many cases because ambiguity in the locus of church authority may itself necessitate an impermissible inquiry into church polity. See also Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 370, 90 S.Ct. 499, 501, 24 L.Ed.2d 582 (1970) ("[U]se of the Watson approach is consonant with the prohibitions of the First Amendment only if the appropriate church governing body can be determined without ... extensive inquiry into religious polity.") (Brennan, J., concurring). In Milivojevich, the Court emphasized that no change in formal title to property was involved in the defrocking and church reorganization at issue in that case. 426 U.S. at 718-19 & n. 11, 96 S.Ct. at 2385. The Milivojevich Court's rejection of the state court's attempt to apply "neutral principles of law" to decide whether the reorganization at issue complied with the church constitution suggests that the state's interest in providing a civil court forum for ecclesiastical disputes is substantially diminished where the controversy does not concern formal title to property. See id.; Bouldin v. Alexander, 82 U.S. (15 Wall.) 131, 21 L.Ed. 69 (1872) ("It may be conceded that we have no power to revise or question ordinary acts of church discipline, or of excision from membership. We have only to do with rights of property.").
 
 
 28
 Individual grievants undoubtedly have some interest in obtaining a civil court adjudication of their ecclesiastical claim. Where religious organizations create a system of ecclesiastical tribunals to hear disputes concerning church governance or administration, however, the grievants' interest in obtaining civil court review of that tribunal's decision is substantially lessened. See, e.g., Watson v. Jones, 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1872) (whenever questions of "ecclesiastical rule, custom or law have been decided by the highest ... church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them"); Milivojevich, 426 U.S. at 713, 96 S.Ct. at 2382 (constitution mandates that civil courts "are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law"). Nevertheless, the grievants retain a strong interest in obtaining a civil forum where the religious tribunal's decision is tainted by fraud or collusion. See, e.g., Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929); Milivojevich, supra.
 
 III
 
 29
 Applying this balance of interests to the facts of this case, we conclude that the district court correctly found that civil court resolution of this controversy would violate the first amendment. This controversy is one step removed from a major doctrinal conflict between two factions within the Southern Baptist Convention. Although a civil court might be able to avoid questions of religious beliefs or doctrines in ruling on the issue of whether the SBC Committee on Boards elected at the 1985 Convention was entitled to serve in that capacity, "questions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern." Milivojevich, 426 U.S. at 716, 96 S.Ct. at 2384.
 
 
 30
 We need not rely, however, upon the risk that a court would have to resolve questions of religious doctrine and belief in order to decide this case because other interests implicated by the controversy strongly favor deferring to the decisions of the messengers at the 1985 Convention and the 1985 SBC Executive Committee. First, the SBC provides its own rules for determining how the membership of the Committee on Boards is to be selected. In this case, a majority of messengers at the 1985 Convention voted in favor of the nominees for the Committee on Boards submitted by the Committee on Committees.[19] Appellants appealed to the Executive Committee of the SBC to contest Chairman Stanley's rulings. The Executive Committee rejected the arguments of appellants' counsel and affirmed the election of the 1985 Committee on Boards. The first amendment strongly favors deference to such a decision by the highest church judicatory concerning a matter of church governance.[20] See Milivojevich, supra. Second, the controversy bears only a tangential relationship to property rights. Although appellants contend that the SBC bylaws create enforceable contract rights under Georgia law, the denial of these alleged rights is unrelated to any question of ownership of property that would give rise to a state interest in assuring prompt resolution of the controversy by a civil court forum. The state has little interest in determining which individuals within the SBC choose the nominees for positions in which they administer assets that are undisputably owned by the SBC. Finally, appellants' interest in obtaining a civil court forum is insubstantial. Appellants received a hearing and a decision on their claims before the highest SBC tribunal. Moreover, appellants have made no allegation of fraud or collusion on the part of Chairman Stanley or any SBC officer or organization.
 
 
 31
 In balancing these interests, we hold that the first amendment bars civil court resolution of this controversy concerning a matter of ecclesiastical government.[21] We therefore affirm the judgment of the district court dismissing this action.
 
 
 32
 AFFIRMED.
 
 EDMONDSON, Circuit Judge, concurring:
 
 33
 A generous zone of judicial noninterference surrounds religious affairs. In certain church property disputes, courts are allowed to adjudicate the controversy by application of neutral legal principles; but the present case is not such a dispute. To exercise judicial authority in this matter would represent a change in the law. I concur in the court's judgment because adjudication of this case by the federal courts would require the courts to favor the view of one element of the Southern Baptist Convention over the view of another directly concerning the Convention's governance. As I understand our history, the Framers of the Bill of Rights did not intend for federal officers to express official preferences regarding the internal administration of religious groups.
 
 
 
 [1]
 The Southern Baptist Convention was incorporated by a special act of the Georgia legislature in 1845 "for the purpose of eliciting, combining, and directing the energies of the Baptist denomination of Christians, for the propagation of the gospel, any law, usage, or custom to the contrary notwithstanding." Article II of the SBC constitution provides that:
 It is the purpose of the Convention to provide a general organization for Baptists in the United States and its territories for the promotion of Christian missions at home and abroad and any other objects such as Christian education, benevolent enterprises, and social services which it may deem proper and advisable for the furtherance of the Kingdom of God.
 
 
 [2]
 SBC bylaw sixteen stated that members to the Committee on Boards "shall be nominated to the Convention by the Committee on Committees."
 
 
 [3]
 Messenger Slatton moved to substitute leaders of the participating state baptist conventions to serve on the Committee on Boards. The following dialogue illustrates the effect of the chair's ruling on Messenger Slatton's motion:
 Messenger Slatton: [W]e have within our reach today to do something substantive that will put the Convention back on the road to peace. And that is to put in these positions persons who have passed plebiscites in their individual states. I say this with no prejudice toward the report of the Committee or toward the persons nominated by the Committee. But the trust level is significantly higher in those who have been elected in the local states. It's utterly inappropriate to come to this--
 Chairman Stanley: You need to talk about the person, and not the whole philosophy.
 Messenger Slatton: All right.
 Chairman Stanley: If you'd just--
 Messenger Slatton: I've already said I didn't come here to make accusations against anybody or to argue the superior merits of anyone, other than the superior merits of the Plan.
 And so, in the interests of the Plan, I nominate, first of all, the lady I mentioned, Carolyn Miller, in place of Jane Riley Wiggins.
 Chairman Stanley: All right. To speak to this motion is Al Jackson.
 Messenger Jackson: I'm Al Jackson, Messenger from Lakeview Baptist Church in Allren. I placed in nomination the name of Jane Riley Wiggins to serve on the Committee on Boards. She's a very godly lady. She's served in almost every capacity in the life of her church.... She's served as Sunday School teacher, V.B.S. teacher, a member of the Missions Committee, the Budget Committee, the Nominating Committee. She's been on mission trips. She's served as the president of the W.M.U. in the church, church training teacher, youth worker, choir member. She and her family are some of the most generous, loyal, supportive Southern Baptists that I know.
 
 
 [4]
 Under SBC bylaw 20(5)(a), the Executive Committee is empowered to "act for the Convention ad interim in all matters not otherwise provided for."
 
 
 [5]
 The record is unclear as to whether the Executive Committee's "ad interim" power might enable it to unseat the members of the Committee on Boards elected at the 1985 Convention
 
 
 [6]
 Appellant H. Allan McCartney was granted permission to intervene under Fed.R.Civ.P. 24(b)
 
 
 [7]
 Appellants sought a declaration: (1) that bylaw 16 allowed any registered messenger to propose amendments from the floor of the convention to offer either individual candidates or a slate of candidates for the Committee on Boards as an amendment to the report of the Committee on Committees; (2) that bylaw 32 gives the floor of the convention the right to amend the body of any report, including the Committee on Committees' nominations for the Committee on Boards; and (3) that bylaw 35 grants majority vote control to the messengers and binds the chair to such a vote on matters of parliamentary procedure
 
 
 [8]
 Appellants contended that Chairman Stanley violated SBC bylaw 32 when he overruled the vote of a majority of the messengers at the 1985 Convention to permit Messenger Slatton's motion to amend the slate of nominees submitted by the Committee on Committees. Bylaw 32 reserves to the Convention "the right to consider and amend the body of all reports." Bylaw 35 leaves little doubt as to the authority of a vote by a majority of the messengers: "[a]ll propositions, decisions, and choices shall be by a majority vote of the registered messengers present and voting, except where provisions have been made for a greater than majority vote." Moreover, by refusing to recognize repeated attempts to raise points of order, appellants allege that Chairman Stanley violated bylaw 11 that makes Roberts Rules of Order the parliamentary authority of the SBC. Finally, appellants alleged that Chairman Stanley violated bylaw 16 by refusing to permit any amendments to the Committee on Committees' nominations to the Committee on Boards
 
 
 [9]
 The SBC has convened twice during the pendency of this lawsuit
 
 
 [10]
 Appellees also sought to limit all further proceedings in the case until the motion to dismiss was resolved
 
 
 [11]
 The Court's Hull Church decision suggests that the establishment clause based prohibition against excessive government entanglement with religion is implicated where the method of dispute resolution involves an inquiry into religious beliefs or doctrines. It is now well settled that even where the government's action is not aimed at establishing, sponsoring, or supporting religion, the government action still violates the establishment clause if the end result of the action is an excessive government entanglement with religion. Walz v. Tax Commission of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The continued vitality of this "third prong" of the Lemon test has been reaffirmed by the Court in its most recent term. See Edwards v. Aquillard, --- U.S. ----, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); Hobbie v. Unemployment Appeals Comm., --- U.S. ----, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). Of course, as discussed supra, excessive government entanglement in this context also may affect associational conduct and thereby chill the free exercise of religious beliefs
 
 
 [12]
 The Jones Court summarized the "neutral principles of law" approach developed by Georgia courts as involving an examination of the deeds to the properties, the state statutes dealing with implied trusts, the corporate charter, the church constitution, and the Book of Church Order to determine whether there was any basis for a trust in favor of the general church. In the absence of any basis in these documents for finding an implied trust, the court would find that legal title to the property was held by the local church
 
 
 [13]
 Jones involved a dispute over rights to the Vineville Presbyterian Church in Macon, Georgia. A majority of the Vineville church members voted to separate from the Presbyterian Church in the United States (PCUS). The PCUS responded by declaring that the minority of the Vineville church who remained loyal to the PCUS constituted the "true congregation of Vineville Presbyterian Church." The minority faction brought a class action in state court seeking declaratory and injunctive orders establishing their right to exclusive possession and use of the Vineville church property. The Georgia courts, purporting to apply a "neutral principles of law" approach, awarded the property rights to the majority faction
 
 
 [14]
 See also Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 369, 90 S.Ct. 499, 500-02, 24 L.Ed.2d 582 (1970) ("To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine.") (Brennan, J., concurring). The Jones majority also concluded that Georgia courts might have to defer to the decision of the highest ecclesiastical authority within the church on the question of which of two factions within the local church constituted the "true" congregation of that church because resolving this question might involve issues of religious doctrine
 
 
 [15]
 Kedroff quoted from Gonzalez as indicating that fraud, collusion, or arbitrariness might constitute an "improper method of choice" of clergy that might justify civil court review of the matter
 
 
 [16]
 Although Kedroff involved state legislation, any doubt as to the applicability of the Court's holding to judicial proceedings was resolved when the St. Nicholas Cathedral controversy came before the Court a second time after the state courts attempted to resolve the controversy on the basis of the common law. See Kreshik v. Saint Nicholas Cathedral, 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) ("[i]t is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize.")
 
 
 [17]
 See also Kedroff, 344 U.S. at 116, 73 S.Ct. at 154 ("Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion.") (citing Gonzalez)
 
 
 [18]
 The Court left open the possibility that civil courts might engage in " 'marginal civil court review' under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith for secular purposes." Id. at 713, 96 S.Ct. at 2382
 
 
 [19]
 SBC bylaw 35(1) provided that "[a]ll propositions, decisions, and choices shall be by a majority vote of the registered messengers present and voting."
 
 
 [20]
 Appellants' argument that the SBC has a congregational, rather than a hierarchical, form of church governance does little to help their position. The distinction drawn in Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872) between the types of congregational and hierarchical church polities was relevant only to determining the ecclesiastical body to which the civil court must defer in determining rights to use of property. If a congregational form of government is involved and the will of a majority of church members is to control, then the court will enforce the right of a majority of members to use the church property. If the congregational church has officers "in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property." Id. at 725, 20 L.Ed. 666. Under either form of congregational polity, however, the election of the Committee on Boards by the messengers at the 1985 Convention and the affirmance of that decision by the Executive Committee are entitled to deference
 
 
 [21]
 We do not, of course, express an opinion as to whether appellants are correct in arguing that this conclusion overrules several decisions of the Georgia courts. It is sufficient to point out that Georgia courts are powerless to adjudicate religious disputes where doing so violates the United States Constitution. Appellants' argument that denial of civil court review of this case would "establish" a religion is also without merit. Cf. Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos, --- U.S. ----, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (section 702 of Civil Rights Act of 1964 exempting religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion may be applied to secular nonprofit activities of religious corporation without violating establishment clause)