952 P.2d 1190

**Ratko and Radojka DOBROTA, husband and wife, Plaintiffs–Appellants, Cross Appellees,**

v.

**FREE SERBIAN ORTHODOX CHURCH "ST. NICHOLAS" an Arizona corporation, Defendant–Appellee,**

**The Free Serbian Orthodox Diocese of the United States of America and Canada, Inc. and Metropolitan Iriney, Defendants–Appellees, Cross Appellants.**

No. 1 CA–CV 96–0606.

Court of Appeals of Arizona, Division 1, Department D.

Jan. 29, 1998.

As Amended Feb. 10, 1998.

**122**

Law Offices of Mark R. Jewett, P.C. by Mark R. Jewett, Phoenix, for Plaintiffs–Appellants/Cross Appellees.

Ayers & Brown, P.C. by Harvey S. Brown, Phoenix, for Defendant–Appellee.

Snell & Wilmer, L.L.P. by Lonnie J. Williams Jr. Heidi J. Richter, Phoenix, for Defendants–Appellees/Cross Appellants.

## OPINION

RYAN, Judge.

¶ 1   This appeal examines the limits set by the Free Exercise and Establishment of Religion Clauses of the First Amendment of the United States Constitution on a civil court's authority to decide an employment dispute between a priest and his church and diocese. We must also decide whether a civil court must abstain from enforcing an ecclesiastical court's judgment authorizing an award of damages to a priest. We hold that a civil court cannot, consistent with the First Amendment, decide a dispute between a church and its priest concerning the church's termination of a priest's employment. We also hold that a civil court can enforce a diocese's judgment authorizing an award of damages to a priest, as long as enforcement of that award does not entangle the court in matters of church doctrine.

### FACTS AND PROCEDURAL HISTORY

¶ 2   In 1990, Ratko Dobrota, a priest in the Serbian Orthodox Church, fled to Canada to escape persecution in the former Yugoslavia. Upon arrival, Father Dobrota contacted the Serbian Orthodox New Gracanica Metropolitanate Diocese of America and Canada ("Diocese") to request assistance and employment. The Diocese sent Father Dobrota to Phoenix to conduct services at the St. Nicholas Free Serbian Orthodox Church ("Church"). In February 1991 the Church asked the Diocese to appoint Father Dobrota its priest. The Diocesan Bishop appointed Father Dobrota as the Church's temporary priest. The Church agreed to pay him a salary of $800 a month, plus provide health insurance, a furnished apartment with utilities included, and a paid annual vacation, as required by the Diocese's constitution.

¶ 3   Under the Diocese's constitution, the Diocesan Bishop appoints and removes temporary priests. Each priest is responsible only to the Diocesan Bishop for failing to fulfill his clerical duties. In May 1994, however, Nikolas Klipa, the president of St. Nicholas Church, terminated Father Dobrota's employment with the Church. Klipa told Father Dobrota he was no longer allowed to

enter the Church buildings or conduct services there and asked him to vacate the parish rectory by June 15.

¶ 4 When Father Dobrota and his wife refused to leave the rectory, Klipa had the air conditioning unit disabled and the water and telephone service disconnected. Klipa filed two actions in justice court seeking removal of the Dobrotas from the rectory but the justice of the peace dismissed both actions. Klipa then called the police to assist in removing the Dobrotas from the property claiming that they were trespassing. Forced to leave, the Dobrotas were unable to take their personal belongings at that time. When they got their belongings back about three months later, they discovered that some of their property had been taken from the boxes in which it had been packed— allegedly by Klipa and other church members.

¶ 5 The Diocesan Ecclesiastical Court met and determined that the Church had not observed the rules of the Church or the Diocese's constitution. It ordered the Church to pay Father Dobrota the amount of money it owed him from the date of his illegal termination to October 1, 1994—the date on which the Diocesan Bishop released him from his duties as temporary priest. The Ecclesiastical Court also ordered the Church to return to Father Dobrota the articles that had disappeared from his belongings. The Ecclesiastical Court did not set the amount due Father Dobrota, nor did it determine the value of the missing belongings.

¶ 6 The Church did not pay Father Dobrota as ordered and it did not return his belongings. Father Dobrota and his wife [1] then filed a complaint in superior court alleging breach of contract, breach of the covenant of good faith and fair dealing, and other torts against the Diocese and the Church. They alleged that the Church and Diocese breached the contract by refusing to pay Father Dobrota's salary, cutting off utilities to the parish house, forcing them out of the house, and taking their personal belongings. They further alleged that his contract with the Church was governed by the constitution and bylaws of the Diocese. The Dobrotas sought damages arising from the breach of the contract, an order requiring defendants to return their personal belongings or an award for loss of the belongings, and punitive damages.

¶ 7 The Diocese filed a motion for summary judgment arguing that the superior court did not have subject matter jurisdiction over Father Dobrota's complaint because his claims involved ecclesiastical matters. The Diocese asserted that its constitution provided Father Dobrota his only means of seeking redress. The Church joined in the motion.

¶ 8 The superior court ruled that, under the contract between the parties, the parties were bound to resolve any dispute concerning Father Dobrota's employment under the constitution, rules, and regulations of the Diocese. The court also noted that it would not sit as a court of appeals from the Ecclesiastical Court nor hear claims under state or federal labor statutes.

¶ 9 The superior court further found that the Ecclesiastical Court had made a partial determination of Father Dobrota's rights. It had determined that Father Dobrota had been wrongfully terminated and that he had lost some property, but it had not yet set forth the amount of damages. The trial court ruled that it had subject matter jurisdiction to enforce a judgment ordered by the Ecclesiastical Court because it could do so without interfering with the free exercise of religion or inquiring into church doctrine. The court concluded, however, that Father Dobrota was required to exhaust his remedies with the Ecclesiastical Court before he could ask the superior court to enforce or execute upon a judgment. Because the Ecclesiastical Court had not set the amount of damages, the trial court concluded it did not have the authority to hear Father Dobrota's claims. Accordingly, the court dismissed Father Dobrota's complaint without prejudice.

¶ 10 Father Dobrota appealed from the judgment in favor of the Diocese and the Church. The Diocese filed a cross-appeal from the judgment. We have jurisdiction

1. Mrs. Dobrota died on October 16, 1996.

**124**

under Arizona Revised Statutes Annotated section 12–2101(B).

## DISCUSSION

¶ 11 We first address the parties' challenges to the subject matter jurisdiction of the trial court. The Diocese argues that because the First Amendment to the United States Constitution precludes a civil court from inquiring into ecclesiastical matters, the trial court lacked subject matter jurisdiction over any of Father Dobrota's claims. It maintains that employment disputes concerning clergy are inherently ecclesiastical and thus not subject to review by a civil court.

■ ¶ 12 At the outset we note that sometimes courts have used the word "jurisdiction" imprecisely. Here we use jurisdiction to mean a court's "authority to do a particular thing." *See Taliaferro v. Taliaferro*, 186 Ariz. 221, 223, 921 P.2d 21, 23 (1996). A civil court obviously has the authority to adjudicate the types of claims in Father Dobrota's complaint. The issue presented is whether the doctrine of ecclesiastical abstention, *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151 (1976), requires the court to abstain from deciding these claims.

■ ¶ 13 The First Amendment guarantees that both individuals and churches have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952). Ecclesiastical decisions are generally protected from government interference; "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Milivojevich*, 426 U.S. at 713, 96 S.Ct. at 2382. "[W]here religious organizations establish rules for their internal discipline and governance, and tribunals for adjudicating disputes over these matters, 'the Constitution requires that civil courts accept their deci-

sions as binding upon them.'" *Crowder v. Southern Baptist Convention*, 828 F.2d 718, 724 (11th Cir.1987), *quoting Milivojevich*, 426 U.S. at 725, 96 S.Ct. at 2388.

■ ¶ 14 The interaction between a church and its pastor is an essential part of church government. *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir.1974). In particular, "a minister's employment relationship with his church implicates 'internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law.'" *Lewis v. Seventh Day Adventists Lake Region Conf.*, 978 F.2d 940, 942 (6th Cir.1992) (quoting *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir.1986)). Thus, civil courts must abstain from deciding ministerial employment disputes or reviewing decisions of religious judicatory bodies concerning the employment of clergy, "because such state intervention would excessively inhibit religious liberty." *Id.; see generally Milivojevich*, 426 U.S. at 709, 96 S.Ct. at 2380 (setting forth the abstention doctrine). Accordingly, "secular courts will not attempt to right wrongs related to the hiring, firing, discipline or administration of clergy." *Higgins v. Maher*, 210 Cal.App.3d 1168, 1175, 258 Cal.Rptr. 757 (1989), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1135, 107 L.Ed.2d 1040 (1990).

■ ¶ 15 The First Amendment prohibits civil adjudication of Father Dobrota's breach of contract claim because his claim challenges Church decisions involving the hiring and firing of its clergy. Review of Father Dobrota's contract claims would have involved the trial court in matters of "internal church discipline, faith, and organization." *Lewis*, 978 F.2d at 942. Thus, the trial court correctly dismissed these contract claims.

■ ¶ 16 Our resolution of the Diocese's challenge to the trial court's subject matter jurisdiction makes it unnecessary for us to resolve Father Dobrota's claim that he had not knowingly contractually limited himself to bringing his claims only before the Diocese's Ecclesiastical Court. Even if Father Dobrota did not expressly agree to submit his claims to the Diocese, as he now argues, he would still be precluded from submitting

the question of the propriety of his termination to a civil court. As noted above, a pastor's employment implicates internal church discipline, faith, and organization; thus, civil court authority over a church employment dispute inhibits religious liberty and is barred by the First Amendment. *Lewis*, 978 F.2d at 942. "[O]ne who enters the clergy forfeits the protection of the civil authorities in terms of job rights." *Higgins*, 210 Cal.App.3d at 1175, 258 Cal.Rptr. 757. Therefore, regardless of whether Father Dobrota knowingly gave up his right to have his claims litigated in a civil court, the only forum available to consider his breach of contract claim was the Diocese's Ecclesiastical Court.

¶ 17 Father Dobrota also raised tort claims concerning the conduct of Klipa in allegedly stealing the Dobrotas' belongings and cutting off their utilities. By limiting Father Dobrota to proceeding solely before the Ecclesiastical Court, the trial court impliedly determined that it could not review these claims. We agree.

¶ 18 Under similar factual circumstances, the California Court of Appeals abstained from resolving a priest's tort claims because his claims were too intimately connected with matters of Church discipline to allow civil review. *Higgins*, 210 Cal.App.3d at 1176, 258 Cal.Rptr. 757. In *Higgins*, the priest alleged that the bishop, and other officials in the church hierarchy, improperly suspended him from his position and published confidential details of his psychiatric treatment and false accusations against him. *Id.* at 1172–73, 258 Cal.Rptr. 757. He pleaded the torts of invasion of privacy, defamation, and intentional and negligent infliction of emotional distress. *Id.* at 1175, 258 Cal.Rptr. 757.

¶ 19 In concluding it could not hear the priest's claims, the *Higgins* court determined that the acts complained of were "part and parcel" of the bishop's administration of his ecclesiastical functions. *Id.* at 1175–76, 258 Cal.Rptr. 757. Although the court agreed that torts such as battery, false imprisonment or conversion could not be perpetrated by a church upon its members with impunity, it held that the torts alleged by the priest were "too close to the peculiarly religious

aspects of the transaction to be segregated and treated separately—as simple civil wrongs." *Id.* at 1176, 258 Cal.Rptr. 757. The *Higgins* court explained that because the torts occurred as "inseparable parts of a process of divestiture of priestly authority," it would not subject the church to civil court proceedings on the tort claims. *Id.*

¶ 20 In comparing this case with *Higgins*, we conclude that the alleged actions of cutting off the Dobrotas' utilities and taking their belongings were inseparable parts of the process of divesting Father Dobrota of his priestly authority. While the alleged acts may have been improper, they occurred as Klipa attempted to remove the Dobrotas and their belongings from the Church premises after the Church terminated Father Dobrota. Furthermore, the Ecclesiastical Court has dealt with the issue of the missing property and ordered its return to Father Dobrota. Therefore, we conclude that the rule of ecclesiastical abstention precludes the trial court from hearing Father Dobrota's tort claims.

¶ 21 However, on the questions of what amounts the Church owes Father Dobrota for unpaid salary and benefits and his missing property, we conclude that the trial court incorrectly found that it could not decide those matters.

¶ 22 As noted above, the general rule is that civil courts must abstain from deciding disputes arising between a church and its clergy. In limited circumstances, however, religious bodies are subject to the authority of civil courts. Because churches, including their local congregations and hierarchy, exist and function within the civil community, "they are as amenable as other societal entities to rules governing property rights, torts and criminal conduct." *Higgins*, 210 Cal.App.3d at 1170, 258 Cal.Rptr. 757 (citing *Watson v. Jones*, 13 Wall. 679, 80 U.S. 679, 732–33, 20 L.Ed. 666 (1871)). *See also Minker v. Baltimore Annual Conf. of United Methodist Church*, 894 F.2d 1354, 1360 (D.C.Cir.1990) (First Amendment does not immunize church from all temporal claims made against it); *United Methodist Church v. White*, 571 A.2d 790, 795 (D.C.App.1990) (church is not above the law and may be held

liable for valid contracts). When civil or property rights are involved, courts may entertain disputes within religious organizations even if some ecclesiastical matters are incidentally involved. *Higgins*, 210 Cal. App.3d at 1174, 258 Cal.Rptr. 757. Such disputes, however, cannot be heard by a civil court if the court must resolve underlying controversies over religious doctrine and practice in order to decide the case. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969).

¶ 23 Setting the amount of Father Dobrota's damages in conformity with the ecclesiastical decision would not constitute a review of that decision, nor would it involve deciding issues of ecclesiastical doctrine or belief. The doctrine of ecclesiastical abstention does not apply where the dispute can be resolved without inquiry into religious law or polity. *Barnes v. Outlaw*, 188 Ariz. 401, 404, 937 P.2d 323, 326 (App.1996) *review granted on cross appeal on different issue*, May 20, 1997; *Paul v. Watchtower Bible and Tract Soc. of New York*, 819 F.2d 875, 878 n. 1 (9th Cir.1987). The court may decide the dispute if the methods of resolution avoid entanglement in questions of ecclesiastical doctrine or belief. *Crowder*, 828 F.2d at 722.

¶ 24 The Ecclesiastical Court determined that Father Dobrota is entitled to his salary and benefits from the time the Church terminated his employment until October 1, 1994. Setting this amount would only involve computation of Father Dobrota's salary and the value of his housing, utilities, benefits and unpaid vacation time. That the court might have to examine church documents concerning what compensation was promised and previously paid to Father Dobrota would not preclude this inquiry. A court may "interpret provisions of religious documents involving property rights and other nondoctrinal matters as long as the analysis can be done in purely secular terms." *Minker*, 894 F.2d at 1358 (citing *Jones v. Wolf*, 443 U.S. 595, 600–01, 99 S.Ct. 3020, 3024, 61 L.Ed.2d 775 (1979)). Certainly, analyzing church records to determine the amount of salary and benefits paid to Father

Dobrota could be done in purely secular terms, particularly where the Ecclesiastical Court already specified the period of time for which payment should be made. Setting the value of Father Dobrota's property would require an economic analysis that the civil court is capable of undertaking without involving itself in Church doctrine. Accordingly, we conclude that the trial court can decide these computation issues.

¶ 25 The Diocese argues that civil court enforcement of judgment against the Church would require the court to inject itself into an inter-church property dispute. It maintains that the First Amendment prohibits enforcement of such a judgment. We disagree.

¶ 26 As noted above, a civil court may decide a church and clergy dispute if the methods of resolving it avoid questions of ecclesiastical doctrine or belief. *See Crowder*, 828 F.2d at 722. In general, the determination of money damages arising from a breach of contract does not create an excessive entanglement in ecclesiastical matters. *See Minker*, 894 F.2d at 1360. Because the Ecclesiastical Court has decided that the Church must pay past compensation and benefits to Father Dobrota, the calculation of the amount would not entangle the superior court in any matter of ecclesiastical doctrine or belief. Therefore, we conclude that the First Amendment does not prohibit the trial court from determining the amount due to Father Dobrota and entering a judgment on which he can execute.

¶ 27 Father Dobrota also argues that the trial court erred in ruling that he had not fully exhausted his claims with the Ecclesiastical Court. We agree.

¶ 28 Article 55 of the Diocesan constitution provides that decrees of the Ecclesiastical Court are final 30 days after delivery unless appealed. Neither party appealed the decree ordering the Church to pay Father Dobrota's back salary and benefits and to return his property.

¶ 29 At oral argument on the motion for summary judgment, the Diocese's counsel stated that the remedies provided to Father Dobrota under the Diocese's constitution had

been exhausted. Also, the Diocese cited to no provision of its constitution, or other document, that would allow it to determine the amount of damages or enforce an award. In fact, the Church represented in its answering brief that because Father Dobrota has been defrocked by the Diocese, "the matter has been concluded as far as the Diocese is concerned."

¶ 30 We will adopt the parties' construction of a contract unless the construction is contrary to the express terms of the contract. *Associated Students of the Univ. of Arizona v. Arizona Bd. of Regents,* 120 Ariz. 100, 104–05, 584 P.2d 564, 568–69 (App. 1978). Here, because the parties believe Father Dobrota has exhausted his remedies with the Ecclesiastical Court, and nothing in the Diocese's constitution is contrary to this view, we accept their characterization of the status of his claims. Having exhausted Diocesan remedies, Father Dobrota is entitled to seek a judgment from the trial court setting forth those damages. The court may determine the amount of his damages and enter an appropriate judgment.

**CONCLUSION**

¶ 31 The trial court correctly concluded that it must abstain from deciding Father Dobrota's breach of contract and tort claims against the Church and the Diocese. The court also correctly ruled that it could enforce the judgment entered by the Ecclesiastical Court. The court erred, however, in concluding that Father Dobrota had not exhausted his remedies with the Diocese. Accordingly, we affirm the trial court's judgment dismissing Father Dobrota's breach of contract and tort claims, but reverse that part of the judgment that refuses Father Dobrota's request to determine the amount of his damages and enter judgment. The case is remanded for further proceedings consistent with this opinion.

EHRLICH and PATTERSON, JJ., concur.