224 P.3d 1002 (2010)
AD HOC COMMITTEE OF PARISHIONERS OF OUR LADY OF The SUN CATHOLIC CHURCH, INC., Plaintiff/Appellant-Cross Appellee,
v.
Peter Wheeler REISS and Carma B. Reiss, husband and wife; Peter Wheeler Reiss, Jr. and Lisa Reiss, husband and wife; Art Spina and Ruth Allen aka Ruth Allen Schwichtenberg, Defendants/Appellees-Cross Appellants.
Jeremy Schmuki, individually and as a former Board Member of Our Lady of the Sun, an Arizona corporation; Patrick Lyons, individually and representing those members of Our Lady of the Sun community, who are similarly situated, Plaintiffs/Appellants,
v.
Our Lady of the Sun Catholic Church, Inc., an Arizona corporation and the following persons who had served and/or still serve on the Board of Directors of Our Lady of the Sun: Paul Andrade; Albert Kenneally; Paul Monaghan; Ruth Allen Schwichtenberg; Arthur Spina; Peter Wheeler Reiss, Sr. and Peter Wheeler Reiss, Jr., each individually and as a member of the Board, Defendants/Appellees.
Nos. 1 CA-CV 08-0360, 1 CA-CV 09-0079.
Court of Appeals of Arizona, Division 1, Department B.
February 23, 2010.
*1004 Jennings, Haug & Cunningham, LLP, By Philip G. Mitchell, Craig J. Bolton, Phoenix Attorneys for Plaintiff/Appellant-Cross Appellee Ad Hoc Committee of Parishioners of Our Lady of the Sun Catholic Church, Inc. and Defendant/Appellee Paul Andrade.
The Lynch Law Firm, L.L.C. By Andrew D. Lynch, John C. Shorb, Scottsdale, and Paul G. Ulrich, P.C., By Paul G. Ulrich, Phoenix, Attorneys for Defendants/Appellees-Cross Appellants Peter Wheeler Reiss, Carma B. Reiss, Peter Wheeler Reiss, Jr., Lisa Reiss, Art Spina, and Ruth Allen Schwichtenberg.
Law Office of Maria Salapska, PLLC By Maria Salapska, Phoenix, Attorney for Plaintiffs/Appellants Jeremy Schmuki and Patrick Lyons.
*1005 Jones, Skelton & Hochuli, P.L.C. By Eileen Dennis Gilbride, William D. Holm, Nicholas D. Acedo, Phoenix, Attorneys for Defendants/Appellees Our Lady of the Sun Catholic Church, Inc., Albert Kenneally, Paul Monaghan, Ruth Allen Schwichtenberg, Arthur Spina, Peter Wheeler Reiss, Sr., and Peter Wheeler Reiss, Jr.

OPINION
BARKER, Judge.
¶ 1 This opinion addresses two related cases that are consolidated for purposes of appeal. Each case has common factual elements relating to Our Lady of the Sun Catholic Church, Inc. ("OLS"), and requires us to address different aspects of the ecclesiastical abstention doctrine. For the following reasons, we affirm as modified.

I.
¶ 2 We first address the trial court's dismissal of the verified complaint filed by Jeremy Schmuki and Patrick Lyons.

A.

Facts and Procedural History
¶ 3 Father Francis LeBlanc, an ordained Roman Catholic priest, founded OLS in 1984. Father LeBlanc organized OLS outside of the structure of the Diocese of Phoenix to conduct the Tridentine Latin Mass, to administer traditional sacramental rites of the Roman Catholic Church, and to promote the doctrines, traditions, and liturgy of the Roman Catholic Church.[1] A five-member board of directors governs the church, and only directors serve as officers of OLS. The priest serves as a director and president of OLS. Father LeBlanc was priest and president of OLS until he passed away on September 28, 2006.
¶ 4 In the wake of Father LeBlanc's death, the board of directors, then consisting of Appellant Jeremy Schmuki and Appellees Albert Kenneally, Paul Monaghan, and Arthur Spina, elected Father Paul Andrade as a director and the president of OLS on October 15, 2006. Schmuki was the only director who voted against Father Andrade. Schmuki believed Father Andrade did not meet the qualifications specified in the bylaws to become the OLS priest. Article VI of the bylaws gives the board the power to "select and receive a priest to promote the purposes and objectives of the Corporation" and specifies that "[t]he Priest must indicate a willingness to comply with all of the provisions of the Articles of Incorporation and more specifically Article XI thereof." Article XI of the articles of incorporation prohibits any Roman Catholic priest who was not ordained according to pre-1968 rites from being the OLS priest.[2] Schmuki contends the board failed to ascertain whether Father Andrade was duly ordained according to pre-1968 Roman Catholic rites.
¶ 5 Several days after electing Father Andrade as president, the board voted to remove Schmuki as a director. Patrick Lyons, a former member of the church congregation, along with Schmuki ("Appellants"), filed this *1006 derivative lawsuit on June 7, 2007 against OLS and current and former members of the board of directors, including Father Andrade, Kenneally, Monaghan, Spina, Peter Reiss, Sr., and Ruth Allen Schwichtenberg ("Appellees").[3] Appellants filed a nine-count verified amended complaint and an application for preliminary injunction on May 29, 2008. Count One alleges Appellees breached fiduciary duties to OLS by acting contrary to the OLS bylaws and articles of incorporation when the board appointed Father Andrade as priest of OLS on October 15, 2006. Count Two seeks declaratory relief to invalidate the board's actions beginning on October 15, 2006, to reinstate Schmuki as a director, and to force all other directors to resign. Count Three alleges Appellees were grossly negligent in not ascertaining Father Andrade's qualifications in accordance with the bylaws. Count Four alleges fraud against Father Andrade for representing himself as a duly ordained Roman Catholic priest when he knew he did not qualify as one. In Count Five, Appellants claim Father Andrade negligently misrepresented his qualifications to OLS. Count Six alleges conversion against Father Andrade asserting he, under false pretenses, received monetary benefits from OLS and controlled OLS assets. In Count Seven, Appellants claim Father Andrade, under false pretenses, unjustly enriched himself by accepting benefits from OLS. Count Eight alleges conversion against Kenneally for taking gold coins that belonged to OLS. Count Nine alleges Kenneally was unjustly enriched by taking things that belonged to Father LeBlanc's trust.
¶ 6 Kenneally filed a motion to dismiss on June 11, 2008. Subsequently, OLS, Spina, Reiss, Jr., Reiss, Sr., and Schwichtenberg filed a separate motion to dismiss the amended verified complaint on June 11, 2008. Monaghan and Kenneally then joined the second June 11 motion to dismiss. Although Father Andrade filed an answer and a counterclaim to the amended complaint, Father Andrade orally joined the second June 11 motion during the hearing on the motion to dismiss and argued Counts Four through Seven should be dismissed for lack of subject matter jurisdiction. In a signed judgment entered on December 3, 2008, the trial court dismissed Counts One through Three with prejudice for lack of standing and lack of subject matter jurisdiction under the ecclesiastical abstention doctrine, dismissed Counts Four through Seven with prejudice for lack of subject matter jurisdiction under the ecclesiastical abstention doctrine, and dismissed Counts Eight and Nine with prejudice because it was not the "right forum" for the claims. Appellants filed a timely notice of appeal.
¶ 7 On appeal, Appellants advance three arguments. First, Appellants argue the trial court erred in dismissing Counts One, Two, and Three because Appellants have standing and the trial court has subject matter jurisdiction. Second, Appellants argue Counts Four, Five, Six, and Seven are not barred for lack of subject matter jurisdiction under the ecclesiastical abstention doctrine. Finally, Appellants claim the trial court erred in dismissing Counts Eight and Nine because Appellants properly stated claims against Kenneally in the verified complaint and the merits of this issue have not been adjudicated in the probate proceeding.
¶ 8 We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, Arizona Revised Statutes ("A.R.S.") sections 12-2101(B) (2003), and 12-120.21(A)(1) (2003).

B.

Discussion
¶ 9 We review a trial court's grant of a motion to dismiss for an abuse of discretion but review issues of law de novo. Dressler v. Morrison, 212 Ariz. 279, 281, ¶ 11, 130 P.3d 978, 980 (2006). We "uphold dismissal only if the plaintiffs would not be entitled to relief under any facts susceptible of proof in the statement of the claim." Mohave Disposal, *1007 Inc. v. City of Kingman, 186 Ariz. 343, 346, 922 P.2d 308, 311 (1996).
¶ 10 Though the trial court based its decision on both standing and the ecclesiastical abstention doctrine, we turn directly to the issue of the ecclesiastical abstention doctrine and determine that there is no subject matter jurisdiction. Craft v. Cannon, 58 Ariz. 457, 458, 121 P.2d 421, 421 (1942) (a motion to dismiss will be upheld if the record supports any of the grounds asserted in favor of dismissal). We refer to subject matter jurisdiction in the same sense as did the court in Dobrota v. Free Serbian Orthodox Church St. Nicholas, 191 Ariz. 120, 952 P.2d 1190 (App.1998):
At the outset we note that sometimes courts have used the word "jurisdiction" imprecisely. Here we use jurisdiction to mean a court's "authority to do a particular thing." See Taliaferro v. Taliaferro, 186 Ariz. 221, 223, 921 P.2d 21, 23 (1996). A civil court obviously has the authority to adjudicate the types of claims in Father Dobrota's complaint. The issue presented is whether the doctrine of ecclesiastical abstention, Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 709, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151 (1976), requires the court to abstain from deciding these claims.
Id. at 124, ¶ 12, 952 P.2d at 1194. As described below, we do not have "statutory or constitutional power to hear and determine [this] particular type of case." State v. Maldonado, 573 Ariz. Adv. Rep. 8, ¶ 14 (Jan. 7, 2010) ("Jurisdiction in this sense cannot be conferred by the consent of the parties and a court that lacks subject matter jurisdiction cannot adjudicate the action."). Accordingly, the issue of standing is moot and need not be decided. See Maricopa County, Juv. Action No. JA-502394, 186 Ariz. 597, 598-99, 925 P.2d 738, 739-40 (App.1996) (declining to decide question of standing because relief sought was not available under facts of the case).

1. Ecclesiastical Abstention Doctrine
¶ 11 Appellees assert that the doctrine of ecclesiastical abstention divests the court of subject matter jurisdiction over Counts One through Seven because adjudication of these claims requires the trial court to determine whether Father Andrade was a duly ordained Roman Catholic priest, according to pre-1968 rites, which is exclusively an ecclesiastical determination governed by the church. We agree.
¶ 12 The ecclesiastical abstention doctrine was first announced in Watson v. Jones, 80 U.S. 679, 20 L.Ed. 666 (1871),[4] and is embedded in the free exercise and establishment clauses of the First Amendment to the United States Constitution. See Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). The First Amendment applies to the states by its incorporation into the due process clause of the Fourteenth Amendment. U.S. Const. amend. XIV; Employment Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 876-77, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). "The First Amendment and the ecclesiastical abstention doctrine preclude civil courts from inquiring into ecclesiastical matters." Rashedi v. Gen. Bd. of Church of the Nazarene, 203 Ariz. 320, 323, ¶ 14, 54 P.3d 349, 352 (App.2002). Ecclesiastical matters include "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." Watson, 80 U.S. at 733; see also Milivojevich, 426 U.S. at 713, 96 S.Ct. 2372 (specifying ecclesiastical matters are "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law").
¶ 13 The parties agree that OLS is a congregational church, meaning that it is a stand-alone church not governed by a hierarchy of religious institutions or tribunals. For example, OLS is separate from and not within the Roman Catholic Diocese of Phoenix, making it a congregational church. Appellants *1008 contend the ecclesiastical abstention doctrine applies only to hierarchical churches and does not apply to congregational churches like OLS. We disagree. As there is no Arizona case applying the ecclesiastical abstention doctrine to a congregational church, Appellants rely on language in cases regarding hierarchical churches and draw overly narrow distinctions in cases regarding congregational churches.
¶ 14 Watson, the epicenter of ecclesiastical abstention jurisprudence, dealt with a property dispute between two factions of the Walnut Street Church, a part of the hierarchical Presbyterian Church in the United States. 80 U.S. at 681-85. The highest judicatory body of the church determined the minority faction was invalid and its members were no longer part of the church. Id. at 692. This meant the majority faction was the legitimate local church and owner of church property. See id. The minority faction then filed a civil lawsuit to determine which faction owned the church property. Id. at 690. Although the United States Supreme Court resolved the case on standing, id. at 734, it provided a lengthy discussion on the ecclesiastical abstention doctrine. In discussing the contours of the doctrine, the Court stated:
In this class of cases we think the rule of action which should govern the civil courts, founded [on] a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.
Id. at 727.
¶ 15 Similar language discussing the ecclesiastical abstention doctrine in terms of hierarchical churches is present in subsequent Supreme Court opinions. For example, in Milivojevich, a defrocked bishop of the American-Canadian Diocese of the Serbian Eastern Orthodox Church, a hierarchical church, brought a lawsuit to invalidate both his removal and the reorganization of the American-Canadian Diocese by the church. 426 U.S. at 698, 96 S.Ct. 2372. Applying the ecclesiastical abstention doctrine, the Court stated:
In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.
Id. at 724-25, 96 S.Ct. 2372. The above-quoted language from Watson and Milivojevich and similar language in other cases, e.g., Jones v. Wolf, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); Gonzalez v. Roman Catholic Archbishop of Manila, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), emphasize deference to the decisions of hierarchical church tribunals. Although much of the language in these decisions reflects the factual scenario presented by the dispute, the Court does not limit the application of the ecclesiastical abstention doctrine to hierarchical churches.
¶ 16 An insightful and well-reasoned decision by the Illinois Court of Appeals in Bruss v. Przybylo, 385 Ill.App.3d 399, 324 Ill.Dec. 387, 895 N.E.2d 1102, 1122 (2008), rejects the notion that the ecclesiastical abstention doctrine applies only to hierarchical churches. The Bruss court explored both the Supreme Court's development of the ecclesiastical abstention doctrine from Watson to Milivojevich and the current application of the doctrine by lower courts. Bruss, 324 Ill.Dec. 387, 895 N.E.2d at 1111-21. The Bruss court's analysis rests on the distinction between "subject-matter deference" and "procedural deference" in ecclesiastical matters. Id., 324 Ill.Dec. 387, 895 N.E.2d at 1112. "Subject-matter deference" is the controlling principle of the ecclesiastical abstention doctrine. Id. It requires civil courts to abstain from determining ecclesiastical matters-including "a matter which concerns theological *1009 controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." Id., 324 Ill.Dec. 387, 895 N.E.2d at 1114 (quoting Watson, 80 U.S. at 733) (italics omitted).
¶ 17 "Procedural deference" is "deference to a church's own prior adjudication of the dispute brought to the civil courts." Id., 324 Ill.Dec. 387, 895 N.E.2d at 1112. Procedural deference language in cases like Watson and Milivojevich led Appellants to conclude the ecclesiastical abstention doctrine applies only to hierarchical churches. However, this view is mistaken. Subject-matter deference is essential to the existence of procedural deference. Id., 324 Ill.Dec. 387, 895 N.E.2d at 1119, 1121-22. There would be no procedure to which we would defer if the subject matter was not protected by the ecclesiastical abstention doctrine. However, procedural deference is not essential to subject-matter deference. Id. The protections for churches enshrined in the First Amendment do not depend upon whether there is a procedural hierarchy within the church. Thus, the ecclesiastical abstention doctrine applies when a civil court is presented with subject-matter deference regardless of whether there is a hierarchical procedure to which we would also defer. As stated in Bruss, "a congregational church, whatever its formality, enjoys equal protection under the first amendment with a hierarchical church." Id. 324 Ill.Dec. 387, 895 N.E.2d at 1123.
¶ 18 We are persuaded by Bruss and expressly adopt its reasoning on this issue. In Arizona, "if the subject matter of an internal church dispute is not appropriate for state intervention, then abstention is equally compulsory whether the church is congregational or hierarchical, and whether the dispute has been addressed by an adjudicatory body, if any, within the church." Id., 324 Ill.Dec. 387, 895 N.E.2d at 1111. We are persuaded that a contrary interpretation violates the religion clauses of the First Amendment. Not protecting congregational churches would require civil courts to make legal conclusions regarding interpretation and application of ecclesiastical matters, which the First Amendment forbids. See Esformes v. Brinn, 52 A.D.3d 459, 860 N.Y.S.2d 547, 547 (2008) (holding resolution of dispute between members, board of directors, and board of trustees of church regarding termination of rabbi's contract violates the establishment clause); Turner v. Church of Jesus Christ of Latter-Day Saints, 18 S.W.3d 877, 892-93 (Tex.App.2000) (finding the establishment clause prohibits civil courts from determining whether church's missionary training program adequately prepares missionaries for life abroad); but see Roman Catholic Diocese of Jackson v. Morrison, 905 So.2d 1213, 1229-30 (Miss.2005) (holding the establishment clause does not prohibit claims against a Catholic Diocese for priest's sexual abuse of children because the claims do not entangle the court in church doctrine and belief). Thus, if the subject matter of Appellant's dispute is ecclesiastical, we lack jurisdiction to resolve those claims.
¶ 19 We turn now to whether resolution of Counts One through Seven would require the trial court to determine ecclesiastical matters. The Supreme Court has recognized that "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." Jones, 443 U.S. at 604, 99 S.Ct. 3020; see also Md. & Va. Eldership of the Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 370, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring). Thus, depending upon the circumstances, civil courts can resolve at least some church-related disputes through neutral principles of law so long as the case is resolved without inquiry into church doctrine or belief. In some cases Arizona courts have adopted the neutral principles of law approach. See, e.g., Rashedi, 203 Ariz. at 324, ¶ 15, 54 P.3d at 353; Dobrota, 191 Ariz. at 125, ¶ 22, 952 P.2d at 1195.
¶ 20 In Rashedi, the plaintiff alleged that the priest "engaged in sexual relations with [her] by using his position as pastor and spiritual advisor to exert emotional and physical control over her in an attempt to defraud her of money." 203 Ariz. at 322, ¶ 4, 54 P.3d at 351. We framed the issue to be "whether the civil court can adjudicate claims against *1010 certain officials of a religious organization based on their alleged licensing and hiring of a pastor whom they knew or had reason to know was likely to victimize members of that organization." Id. at 324, ¶ 17, 54 P.3d at 353. We noted that "the parties here have not specifically addressed individual claims at this stage of the litigation." Id. at 326, ¶ 27, 54 P.3d at 355. We stated that "[b]ecause [the parties] presented a general challenge to the court's jurisdiction to consider the case, we have addressed the matter generally." Id. Thus, while we determined that neutral principles of law could apply to the dispute in Rashedi, in which a parishioner was sexually victimized by a priest, we did not indicate whether the ecclesiastical abstention doctrine would apply to some or all of the individual claims. And, importantly, we specifically noted that the First Amendment precluded civil courts from "inquir[ing] into internal organizational disputes between different factions." Id. at 323, ¶ 14, 54 P.3d at 352.
¶ 21 In Dobrota, the Diocesan Ecclesiastical Court determined that a priest's termination of employment with the St. Nicholas Free Serbian Orthodox Church was not conducted in accordance with church rules and ordered the church to pay the priest his salary from the date of his illegal termination and to return the priest's property. 191 Ariz. at 123, ¶ 5, 952 P.2d at 1193. The priest filed a civil lawsuit when the church refused to pay his salary and return his belongings. Id. at ¶ 6. We noted that "a civil court may decide a church and clergy dispute if the methods of resolving it avoid questions of ecclesiastical doctrine or belief." Id. at 126, ¶ 26, 952 P.2d at 1196. We held that "[b]ecause the Ecclesiastical Court has decided that the Church must pay past compensation and benefits to [the priest], the calculation of the amount would not entangle the superior court in any matter of ecclesiastical doctrine or belief." Id. Thus, neutral principles of law were used to determine the priest's monetary damages. Id.
¶ 22 Appellants repeatedly claim, and state in the amended complaint, that they are not asking the court to determine if Father Andrade was a duly ordained Roman Catholic priest on October 15, 2006, but only if the board acted ultra vires in electing him and if Father Andrade acted tortiously in representing his qualifications to the board. In particular, the amended complaint contends "that the Board and each individual member thereof failed in its fiduciary duties to ascertain that Andrade was a duly ordained Roman Catholic priest in good standing with the Holy Roman Catholic Church, before appointing him as both the priest and Board member, and confirm both his ability (i.e., qualifications) and willingness to comply with all of the provisions of the Articles of Incorporation and By-Laws." Appellants contend the court can use neutral and secular principles of corporate governance to resolve the dispute.
¶ 23 Our court stated in Konkel v. Metropolitan Baptist Church, Inc., 117 Ariz. 271, 272, 572 P.2d 99, 100 (App.1977), that "[t]here is a recognized exception [to the doctrine of ecclesiastical abstention], however, where the issue is whether the expelling organization acted in accordance with its own regulations." Id. Any reliance on Konkel is questionable because it did not consider Milivojevich's application of the ecclesiastical abstention doctrine to allegations that a church failed to follow its own laws and procedures.[5]See Milivojevich, 426 U.S. at 712-13, 96 S.Ct. 2372; cf. Hutchison v. Thomas, 789 F.2d 392, 396 (6th Cir.1986) ("The `neutral principles' doctrine has never been extended to religious controversies in the areas of church government, order and discipline.").
¶ 24 We decline to apply the neutral principles doctrine here because resolution of this case requires the court to impermissibly resolve questions of church doctrine and faith. Despite Appellants' insistence that the relief sought is a judicial mandate that the board follow the bylaws and articles of incorporation, *1011 this relief requires a judicial determination of whether Father Andrade was a Roman Catholic priest duly ordained according to pre-1968 rites, as required by the bylaws and articles of incorporation. Review of the amended complaint confirms that Appellants actually seek judicial determination of Father Andrade's qualifications to be the OLS priest. For example, the amended complaint alleges, "Defendants had a duty to act diligently, prudently and with due care to follow the OLS Articles and By-Laws, including to ensure that the priest selected for OLS and its Board has the necessary background (including being duly ordained as a Roman Catholic priest, according to pre-1968 rites)." (Emphasis added.) The amended complaint further alleges, "Defendant Andrade, through active representations orin the alternativethrough deceitful omissions and nondisclosures represented himself as a duly ordained Roman Catholic priest."
¶ 25 A civil court cannot determine (1) if the board acted ultra vires by electing Father Andrade or (2) if Father Andrade acted tortiously, without deciding whether Father Andrade possessed the qualifications to be the OLS priest and president as specified in the bylaws and articles of incorporation. "[I]t is the function of the Church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." Gonzalez, 280 U.S. at 16, 50 S.Ct. 5; see also Dobrota, 191 Ariz. at 122, 952 P.2d 1190 ("We hold that a civil court cannot, consistent with the First Amendment, decide a dispute between a church and its priest concerning the church's termination of a priest's employment."). Thus, civil-court resolution of Counts One through Seven is impermissible under the ecclesiastical abstention doctrine.[6]
¶ 26 Appellants suggest the fraud exception to the ecclesiastical abstention doctrine applies to this case. The Supreme Court hinted at the possibility of "marginal civil court review" of such an exception in Gonzalez when it stated, "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper Church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." Presbyterian Church, 393 U.S. at 447, 89 S.Ct. 601; Gonzalez, 280 U.S. at 16, 50 S.Ct. 5. However, the complaint in Gonzalez did not allege fraud, collusion, or arbitrariness, and neither the Supreme Court nor any Arizona court has applied any such exception.
¶ 27 Whether a fraud exception to the ecclesiastical abstention doctrine exists at all, we need not decide. The asserted fraud in this case is that Andrade held himself out as being ordained pursuant to pre-1968 rites. To resolve whether this assertion was fraudulent would require us to inquire into Church doctrine, i.e. what constitutes compliance with pre-1968 rites. Such an inquiry would violate the ecclesiastical abstention doctrine. See Milivojevich, 426 U.S. at 713, 96 S.Ct. 2372 (applying the arbitrariness exception would "entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question" and would be "the inquiry that the First Amendment prohibits").[7] Accordingly, the trial court properly dismissed *1012 Counts One through Seven for subject matter jurisdiction.[8]

2. Abatement
¶ 28 In Counts Eight (conversion) and Nine (unjust enrichment), Appellants allege Kenneally failed to give OLS gold coins and possibly other assets belonging to the late Father LeBlanc. At the time Appellants filed this lawsuit, an action was pending in the probate court to administer Father LeBlanc's estate. Although Lyons and his wife filed a motion containing similar allegations in the probate proceeding, the probate court dismissed the motion. The trial court dismissed Counts Eight and Nine because it was not the "right forum" for the claims. By this, the trial court held the probate action abated Counts Eight and Nine of the complaint.
¶ 29 "[T]he pendency of a prior action between the same parties for the same cause in a state court of competent jurisdiction gives grounds for the abatement of a subsequent action either in the same court or in another court of the state having like jurisdiction." Allen v. Superior Court of Maricopa County, 86 Ariz. 205, 209, 344 P.2d 163, 166 (1959). The test for abatement is "whether the two actions present a substantial identity as to parties, subject matter, issues involved, and relief demanded." Id. Here, both proceedings required the court to identify Father LeBlanc's assets, account for them, and transfer them to the proper beneficiary as specified in the trust. Both proceedings involved substantially the same parties. Kenneally was the former personal representative of the estate, and OLS is specified as the beneficiary of the Father LeBlanc Revocable Trust and has an interest in administration of the estate. "Interested persons," like OLS, can intervene in a probate proceeding. A.R.S. §§ 14-1201(26) (Supp.2009), -3105 (2005). Therefore, the trial court did not err in dismissing the remaining counts in this matter, Counts Eight and Nine, on abatement grounds.[9]

II.
¶ 30 We now turn our attention to the lawsuit filed by the Ad Hoc Committee of Parishioners of Our Lady of the Sun Catholic Church, Inc. (the "Committee").[10]

A.

Additional Facts and Procedural History
¶ 31 Despite Schmuki's efforts to prevent Father Andrade from becoming the priest of OLS, Father Andrade assumed this position. However, the controversy surrounding Father Andrade did not end here. Father Andrade was involved in a car accident on August 17, 2007, the circumstances of which caused concern to the board of directors. The following month, the board of directors sought to remove Father Andrade as priest of OLS. At this time, the board of directors consisted of Peter Wheeler Reiss, Sr., Peter Wheeler Reiss, Jr., Art Spina, and Ruth Allen Schwichtenberg (the "Board"). Father Andrade was the fifth director of the board. Pursuant to the bylaws, a priest can be removed *1013 when four directors vote in favor of removal and then confirm their vote for removal in a second vote cast at least thirty days after the first vote. When removal concerns a priest who has brought "disgrace or disrepute to the Church," the priest is suspended immediately following the first vote in favor of removal.
¶ 32 On September 2, 2007, the Board held a special meeting and voted to suspend Father Andrade. Following Father Andrade's suspension but prior to a second vote, the Committee filed a four-count verified complaint against the Board members[11] to prevent the removal of Father Andrade, to account for funds removed from the OLS bank account, and to recover penalties and fees incurred by OLS when the funds were removed. The Board filed a motion to dismiss alleging (1) the Committee did not have standing to sue, (2) the trial court did not have jurisdiction pursuant to the ecclesiastical abstention doctrine, and (3) the Committee could not obtain the relief it requested from the individuals named in the lawsuit. In a minute entry entered on November 30, 2007, the trial court dismissed the complaint because it found the Committee lacked standing to challenge administrative decisions of OLS. The trial court did not address the other arguments in support of the motion to dismiss. The Committee timely appealed. The Board appeals the trial court's denial of its motion for attorneys' fees and costs.
¶ 33 Though the trial court dismissed the complaint on the issue of standing, the issue of the ecclesiastical abstention doctrine was properly before the court. We again turn our analysis to the ecclesiastical abstention doctrine and determine there is no subject matter jurisdiction. See supra ¶ 10. Therefore, we need not address the issue of standing.

1. Ecclesiastical Abstention Doctrine

a.
¶ 34 Count One seeks injunctive relief for the Board's failure to adhere to the procedures in the bylaws when it suspended Father Andrade. In particular, the Committee contends the special meeting was not properly noticed and the Board cannot remove Father Andrade because it only voted to suspend him. The Committee claims the Board's removal of Father Andrade has "threatened the very existence of the Church." Count Three seeks declaratory relief for the Board's alleged breach of fiduciary duties to OLS. Specifically, the Committee contends the Board breached its duty of due care when it "failed to adequately and fully investigate the facts surrounding the automobile accident of the Priest," failed to follow the removal procedures in the bylaws, attempted to evict Father Andrade from the OLS rectory against the wishes of the parishioners, and "failed to make prior and prudent provisions for carrying on the business of the Church when suspending the Priest." The Committee also alleges the Board breached the duty of loyalty and the duty of good faith by acting contrary to the bylaws and failing to follow the wishes of the parishioners.
¶ 35 Although the Committee contends the issue in Counts One and Three is a matter of corporate governance and procedure,[12] the core issue in these Counts is *1014 whether Father Andrade should be removed, or was properly suspended, as priest of OLS. Consistent with First Amendment requirements, "secular courts will not attempt to right wrongs related to the hiring, firing, discipline or administration of clergy." Dobrota, 191 Ariz. at 124, ¶ 14, 952 P.2d at 1194 (citation omitted). "[O]ne who enters the clergy forfeits the protection of the civil authorities in terms of job rights." Id. at ¶ 16 (citation omitted); see also Lewis v. Seventh Day Adventists Lake Region Conference, 978 F.2d 940, 942 (6th Cir.1992) ("[A] minister's employment relationship with his church implicates `internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law.'" (quoting Hutchison, 789 F.2d at 396); Se. Conference Ass'n of Seventh-Day Adventists, Inc. v. Dennis, 862 So.2d 842, 844 (Fla.Dist.Ct. App.2003) ("[C]ivil courts must abstain from deciding ministerial employment disputes or reviewing decisions of religious judicatory bodies concerning the employment of clergy, `because such state intervention would excessively inhibit religious liberty.'" (quoting Lewis, 978 F.2d at 942)).
¶ 36 Thus, termination of Father Andrade's employment with OLS is an ecclesiastical matter governed exclusively by OLS. The trial court did not err in dismissing Counts One and Three.

b.
¶ 37 Counts Two and Four address the use of OLS church funds. The Committee alleges: "Art Spina has emptied all bank and financial accounts of the Church, taking the proceeds thereof in cashier's checks or in cash. The balances removed from the Church's accounts amount to a sum of at least $1,654,724.00." Count Two requests an accounting of the funds that have been removed from the OLS bank accounts and seeks judicial oversight that OLS "[u]tilize such funds only in satisfaction of the ordinary and customary conduct of Church business." Count Four seeks additional money damages for losses attributable to Art Spina's alleged removal of funds from the OLS accounts.
¶ 38 The Committee does not allege conversion by Art Spina and does not seek return of funds to OLS. Rather, the Committee requests an accounting and repayment of penalties and fees. As far as we can tell from these allegations, the well-pleaded facts only prove that the Board may have changed church bank accounts.
¶ 39 On the basis of these facts, this is an internal organizational dispute among OLS factions in which the Committee seeks to manage the day-to-day financial affairs of OLS. Resolution of this dispute would require the court to determine which financial activities are in compliance with the purposes of OLS and "in satisfaction of the ordinary and customary conduct of Church business." Essentially, the Committee wants the court to look over the shoulder of the Board and see if funds are being spent in conformity with church purposes. The First Amendment prohibits such an examination. The ecclesiastical abstention doctrine precludes court "inquir[y] into internal organizational disputes between different factions of a religious organization or into property disputes that would require interpreting religious doctrine or practice." Rashedi, 203 Ariz. at 323-24, ¶ 14, 54 P.3d at 352-53. Civil courts cannot get involved in daily financial matters of religious institutions that are "too close to the peculiarly religious aspects of the transaction to be segregated and treated separatelyas simple civil wrongs." Dobrota, 191 Ariz. at 125, ¶ 19, 952 P.2d at 1195 (quoting Higgins v. Maher, 210 Cal.App.3d 1168, 258 Cal.Rptr. 757, 761 (1989)). We need not decide if and under what circumstances the doctrine may apply when conversion is asserted, as that is not the case here. See State v. Burckhard, 592 N.W.2d 523, 526 ¶ 10 (N.D.1999) (upholding dismissal of criminal *1015 information charging priest with theft of $100,000.00 belonging to church where bishop who oversees priest's authority chose not to prosecute priest for violating church administrative authority). The trial court properly dismissed Counts Two and Four.

2. The Board's Cross-Appeal for Costs and Attorneys' Fees
¶ 40 The Board timely cross-appealed the trial court's denial of its application for attorneys' fees and costs. A trial court has broad discretion to grant or deny an award of attorneys' fees in a contract action. Robert E. Mann Constr. Co. v. Liebert Corp., 204 Ariz. 129, 133, ¶ 13, 60 P.3d 708, 712 (App.2003). We review the trial court's decision for an abuse of discretion and uphold the ruling if it is supported by any reasonable basis. Fulton Homes Corp. v. BBP Concrete, 214 Ariz. 566, 569, ¶ 9, 155 P.3d 1090, 1093 (App.2007). "To find an abuse of discretion, there must either be no evidence to support the superior court's conclusion or the reasons given by the court must be `clearly untenable, legally incorrect, or amount to a denial of justice.'" Charles I. Friedman, P.C. v. Microsoft Corp., 213 Ariz. 344, 350, ¶ 17, 141 P.3d 824, 830 (App.2006) (quoting State v. Chapple, 135 Ariz. 281, 297 n. 18, 660 P.2d 1208, 1224 n. 18 (1983)).
¶ 41 Arizona Revised Statute § 12-341.01 gives the trial court discretion to award reasonable attorneys' fees to the successful party in contract actions. A.R.S. § 12-341.01(A) (2003). The Arizona Supreme Court has specified six factors Arizona courts should consider in determining if an award of attorneys' fees is appropriate. Wagenseller v. Scottsdale Mem'l Hosp., 147 Ariz. 370, 394, 710 P.2d 1025, 1049 (1985), superseded by statute on other grounds as recognized by Chaboya v. Am. Nat'l Red Cross, 72 F.Supp.2d 1081, 1092 (D.Ariz.1999). These factors include:
(1) whether the unsuccessful party's claim or defense was meritorious;
(2) whether the litigation could have been avoided or settled and the successful party's efforts were completely superfluous in achieving the result;
(3) whether assessing fees against the unsuccessful party would cause an extreme hardship;
(4) whether the successful party prevailed with respect to all of the relief sought;
(5) whether the legal question presented was novel and whether such claim or defense have previously been adjudicated in this jurisdiction; and
(6) whether the award would discourage other parties with tenable claims or defenses from litigating or defending legitimate contract issues for fear of incurring liability for substantial amounts of attorney's fees.
Id.
¶ 42 The trial court found the lawsuit was contractual in nature but denied the Board's application for costs and attorneys' fees because "the individual members of the Ad Hoc Committee had a basis for bringing the suit." Although the trial court did not state in the minute entry that it considered the six factors, we presume that it did. State v. Ramirez, 178 Ariz. 116, 128, 871 P.2d 237, 249 (1994) ("[T]he trial court is presumed to know and follow the law."). The trial court's statement related to the standing issue, an issue which we need not address. The trial court's statement was pertinent to both the first and fifth Wagenseller factors. It was not an abuse of discretion to deny the Board's request for attorneys' fees on these grounds.
¶ 43 Arizona Revised Statute § 12-341 specifies that "[t]he successful party to a civil action shall recover from his adversary all costs expended or incurred therein unless otherwise provided by law." A.R.S. § 12-341 (2003). Unlike § 12-341.01, the award of costs to the successful party is mandatory. Multari v. Gress, 214 Ariz. 557, 560, ¶ 21, 155 P.3d 1081, 1084 (App.2007). The trial court's minute entry neither granted nor denied the Board's request for costs. The Board was the successful party because the court granted its motion to dismiss and denied the Committee's motion for new trial and motions to amend. Therefore, the trial court erred in not awarding the Board its costs of $191.00. Because the Committee is not a distinct legal entity from its individual members, the *1016 Board can collect its costs from the individual members.

III.

Conclusion
¶ 44 For the reasons stated above, we affirm the judgments as to both cases in their entirety except we modify the judgment in CV 2007-017468 to award costs of $191.00 to the Board. All parties request attorneys' fees and costs incurred on appeal. In the exercise of our discretion, we deny the fee requests but award costs on appeal to Appellees and the Board.
CONCURRING: PATRICIA K. NORRIS, Presiding Judge, and PETER B. SWANN, Judge.
NOTES
[1] The bylaws, dated January 31, 1991, further specify:

The purposes for which OUR LADY OF THE SUN CATHOLIC CHURCH, INC. (hereinafter the "Corporation") is organized are: to preserve and promote the doctrines, traditions and liturgy of the traditional Roman Catholic Faith, to sponsor and conduct the Tridentine Latin Mass and to promote the exclusive celebration thereof; to sponsor and conduct the traditional sacramental rites of the Church and to promote the exclusive administration thereof; to educate the laity in the doctrines, traditions and liturgy of the traditional Roman Catholic Faith; to establish and maintain facilities for ministering to the spiritual needs of members of the traditional Roman Catholic Faith; to cooperate with similar organizations in pursuance of the foregoing purposes; and for religious, educational and charitable purposes, together with all other purposes not forbidden by law in connection with the foregoing.
[2] Provision 4 of Article XI states:

Priests and/or other Catholic clergymen who have received ordination according to the new Rite of Ordination promulgated on June 18, 1968 or according to translations thereof are forever barred from serving [as] Officers or Directors of the Corporation and from performing religious services in facilities operated by the Corporation, unless they have first received ordination sub conditione in the traditional rite.
[3] Kenneally, Monaghan, and Spina were directors when Father Andrade was elected to the board on October 15, 2006. After October 2006, Reiss, Sr. was elected to the board to replace Schmuki, and Schwichtenberg was elected to the board to replace Kenneally. Peter Wheeler Reiss, Jr. was elected to the board to replace Monaghan in January 2007, and was named as a defendant in the amended complaint of May 29, 2008.
[4] Although Watson was based on federal common law, the Court has explicitly applied Watson to the First Amendment. Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).
[5] Although Milivojevich declined to apply the neutral principles of law approach, it held that a civil court cannot find a church's decision arbitrary because the church failed to follow church law and procedures. Milivojevich, 426 U.S. at 713, 96 S.Ct. 2372. Thus, Milivojevich is instructive on whether a court can neutrally apply corporate governance principles to a church-related dispute.
[6] We do not have before us, and need not decide, the scope of the doctrine as it pertains to church employees who are not involved in matters of church doctrine and faith.
[7] The Milivojevich Court further reasoned:

But it is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon, and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.
Id. at 714, 96 S.Ct. 2372 (quoting Watson, 80 U.S. at 733).
[8] Appellants contend the trial court's failure to dismiss Father Andrade's counterclaim for defamation demonstrates the trial court has subject matter jurisdiction over Counts One through Seven. However, the trial court only concluded it would make no ruling on the counterclaim because it was not at issue in the motion to dismiss.

On appeal, Father Andrade raises additional arguments as to why the trial court properly dismissed Appellant's complaint. Father Andrade waived these arguments because he failed to assert them before the trial court. See Maher v. Urman, 211 Ariz. 543, 548, ¶ 13, 124 P.3d 770, 775 (App.2005) (arguments brought for first time on appeal are waived).
[9] The trial court should have treated Counts Eight and Nine of the motion to dismiss as a motion for summary judgment because Kenneally attached probate court documents and other information to the motion. See Ariz. R. Civ. P. 12(b). However, the parties do not dispute these facts regarding the probate action, and the trial court correctly applied the law regarding abatement. Therefore, that the trial court treated this as a motion to dismiss rather than a motion for summary judgment is of no consequence.
[10] The Committee is an unincorporated association with five individual members and represents various parishioners of the Church "who regularly attend services at the Church and participate in the other sacramental activities of the Church."
[11] The Committee named Carma B. Reiss and Lisa Reiss as defendants because they are the spouses of directors. Nevertheless, we refer to all the named defendants as the "Board" for clarity.
[12] At oral argument, the Committee contended this dispute is about whether OLS is governed by the 1991 Bylaws or the 1984 Bylaws. After the trial court granted the Board's motion to dismiss the complaint, the Committee asserted this argument for the first time in its motion for new trial. The Committee argued that newly discovered evidence consisting of a copy of the 1984 Bylaws, which specified OLS was a membership corporation, made a new trial and amendment of the complaint appropriate because the 1991 Bylaws were not properly enacted.

The trial court, within its discretion, found no new evidence because it was implausible and "strain[ed] credulity" that the Committee could not argue the 1991 Bylaws were not properly enacted until discovery of a copy of the 1984 Bylaws, which appeared shortly after the court's adverse ruling. See Wendling v. Sw. Sav. & Loan Ass'n, 143 Ariz. 599, 602, 694 P.2d 1213, 1216 (App.1984) ("If [newly discovered evidence] was in the possession of the party before the judgment was rendered, however, it is not newly discovered for the purposes of the rule and does not entitle the party to relief."). Accordingly, the trial court did not abuse its discretion in denying the Committee's motion for a new trial on this issue. The trial court also properly denied the Committee's motion to amend relative to the 1984 Bylaws because the amendments would have been futile. Moreover, even if the trial court abused its discretion in denying the motion for new trial, the removal of Father Andrade and the use of OLS funds are the primary focus of the amended complaint. As we discuss, the ecclesiastical abstention doctrine precludes inquiry into these matters.