937 P.2d 323

James BARNES and Rose Mary Martinez–Barnes, husband and wife; Naomi Martinez Outlaw, in her individual capacity; Isaac Martinez, in his individual capacity, Plaintiffs/Appellees,

v.

James OUTLAW, Jr. and Cleopatra Outlaw, husband and wife; Andrew Outlaw, in his individual capacity; The Church Of Jesus, an Arizona non-profit corporation, Defendants/Appellants.

No. 2 CA–CV 96–0045.

Court of Appeals of Arizona, Division 2, Department B.

Aug. 29, 1996.

As Amended on Denial of Reconsideration Nov. 8, 1996.

Review Denied and Cross Review Granted May 20, 1997.

Beus, Gilbert & Morrill, P.L.L.C. by Maria Crimi Speth and John T. Moshier, Phoenix, for Plaintiffs/Appellees.

Sorenson, Moore, Evens, Marshall & Rocco by J. William Moore and John S. Schaper, Phoenix, for Defendants/Appellants.

## OPINION

ESPINOSA, Presiding Judge.

Defendants/appellants James and Cleopatra Outlaw, their son Andrew Outlaw, and the Church of Jesus appeal from jury verdicts in favor of plaintiffs/appellees Rose Mary Martinez–Barnes, Naomi Martinez Outlaw, and Isaac Martinez on their claims for damages resulting from counseling mal-

practice, breach of fiduciary duty, false light invasion of privacy, invasion of privacy and defamation, and James Barnes's claim for loss of consortium. Appellants challenge the trial court's subject matter jurisdiction and also argue that the court erred in instructing the jury and in denying their motions for directed verdict and judgment notwithstanding the verdict. For the reasons set forth below, we affirm in part and vacate in part.

### Facts and Procedural Background

■ On appeal from a judgment entered on a jury verdict, we view the evidence, and all reasonable inferences arising therefrom, in the light most favorable to the prevailing party. *Callender v. Transpacific Hotel Corp.*, 179 Ariz. 557, 880 P.2d 1103 (App. 1993). Rose Mary Martinez–Barnes is the older sister of Naomi Martinez Outlaw and Isaac Martinez. In the summer of 1986, Pastor J.P. Kirkland referred Rose to James Outlaw, pastor of the Church of Jesus, for counseling, in view of Outlaw's many years of counseling experience. In September, Rose met with Outlaw for help with emotional problems following the breakup of her relationship with Kirkland, with whom she had lived for nine months. Rose subsequently joined the Church and continued to meet with Outlaw for counseling, relating to him highly personal and private matters, including her feelings of guilt about having had a meretricious relationship with a clergyman. About two years later, Naomi moved to Phoenix and joined the Church at Rose's suggestion.

In early 1990, Isaac told Rose he was troubled because his wife had been unfaithful to him. Because she believed Outlaw had helped her, Rose encouraged Isaac to seek counseling with Outlaw about his wife's infidelity. In June, Isaac met with Outlaw and confided that his wife was having an affair with his father. He also confided that, in retaliation for his wife's adulterous conduct, he had had an affair with a close friend of hers. Later, when Rose discovered that her sister-in-law's affair had been with her father, she also discussed the matter with Outlaw.

Naomi and Andrew Outlaw, James Outlaw's son and an associate pastor of the Church, began dating and were married in early 1992. They underwent premarital and marriage counseling with Outlaw. After one counseling session, Naomi met with Outlaw alone and confided to him that her father had once embraced her in an "uncomfortable way." That July, Rose and James Barnes were also married in the Church after undergoing premarital counseling with Outlaw.

By November, Naomi and Andrew had been separated for several months. In December, Naomi went to see him at home and found him and another woman there, both unclothed. A few days later, Andrew served Naomi with annulment papers, alleging "[m]isrepresentation at time of marriage" on Naomi's part. Believing that the annulment was to save Andrew and Outlaw from disgrace in the Church and to counter the accusations made against Naomi in the annulment papers, Rose contacted Church leaders and told them what had happened between Andrew and Naomi. One of the "elders" invited Rose and Naomi to attend a meeting after Sunday services to discuss the situation.

Rose and Naomi went to the Church that Sunday. After the service, Outlaw called Rose into his office and told her he had canceled the meeting. With his wife present, Outlaw told Rose that Naomi was "screwed up" because she had been molested by their father, and intimated he would reveal his "knowledge of [Rose] and a man named Kirkland" if she and Naomi did not drop their accusations against Andrew. As Rose and Naomi were leaving, they were confronted by Outlaw's mother, who told them to stop lying about Andrew because "we know things about your family." Outlaw's sister joined in, telling them not to say anything about Andrew, stating "we know things about your father," and accusing him of adultery. When Rose and Naomi returned to Outlaw's office to use the telephone, Outlaw told them what a "no good" person their father was because he "had sex with his daughters." Outlaw also said that if Rose and Naomi did not drop their accusations against Andrew, they would find out "what kind of person" Outlaw was.

During this exchange, the office door was open and Outlaw's son-in-law was sitting in an empty pew in the sanctuary.

Later that day Outlaw and a Church administrator had a conversation in which Outlaw described the discord between Rose and Naomi and his family. Outlaw also told him that there were "incest problems" between the Martinez siblings and their father and that he had learned of the incest during his counseling sessions with Rose, Naomi, and Isaac. During a Wednesday evening service, Outlaw described Rose's and Naomi's conduct to the congregation, "marked" them as causing division in the Church, and stated that their family was "incestuous" and "dysfunctional." A few days later, Outlaw called a meeting with the Church elders, during which he reported he had counseled Naomi and had been reluctant to show her affection "because of some of the things which had happened to her in the past." He also read aloud a portion of a letter she had written Andrew.

Rose, Naomi, Isaac, and James sued the Outlaws and the Church, asserting numerous claims for relief. At the close of plaintiffs' evidence, the defendants moved for a directed verdict on all claims. The claims for intentional infliction of emotional distress, negligent supervision, conspiracy to inflict emotional distress, and disregard of the Church's corporate entity were dismissed, as were all of James's claims except loss of consortium, and all claims against Andrew. The claims for false light invasion of privacy, invasion of privacy, defamation, malpractice, breach of fiduciary duty, and James's loss of consortium claim were submitted to the jury, which found for appellees on all counts. Appellants' subsequent motions for new trial and judgment notwithstanding the verdict were denied.

### Ecclesiastical Abstention

Appellants first contend that the trial court lacked subject matter jurisdiction under the doctrine of ecclesiastical abstention. They argue that Outlaw was motivated by a "biblical admonition" when he brought appellees' conduct to the attention of the congregation during the "marking" and that the "essence" of the injuries appellees claimed was the termination of their relationship with the Church and its members. As a result, they contend, the trial court was barred from "addressing religious controversies which were beyond the jurisdiction of civil authority."

 The doctrine of ecclesiastical abstention prohibits courts from determining issues of canon law. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). It is not applicable here because this dispute can be resolved without inquiry into religious law and polity. We need not consider the "marking" ritual nor its origins in resolving these issues. Outlaw revealed confidences from his counseling sessions with Naomi to Rose and threatened to publicize Rose's involvement with Kirkland. He divulged confidences of Naomi, Rose, and Isaac to his wife, mother, sister, and the Church administrator and also relayed false information to them. There was no evidence that this conduct was part of the observance of the Church's religious practices or beliefs; thus, the doctrine of ecclesiastical abstention has no bearing here. *See Paul v. Watchtower Bible and Tract Society of New York*, 819 F.2d 875, 878 n. 1 (9th Cir.), *cert. denied*, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).

Moreover, appellants misstate appellees' injury claims. In their complaint, appellees alleged intentional infliction of emotional distress, loss of consortium, damage to their reputations, and exposure to public ridicule and disgrace. That the injuries occurred in a religious setting does not render them noncompensable, nor does it deprive the court of jurisdiction. *See McNair v. Worldwide Church of God*, 197 Cal.App.3d 363, 242 Cal. Rptr. 823 (1987) (free exercise clause did not bar defamation claim against minister for remarks made during meeting explaining church doctrine); *Hester v. Barnett*, 723 S.W.2d 544 (Mo.App.1987) (defamation claim against minister for statements made in sermons compensable); *Guinn v. Church of Christ of Collinsville*, 775 P.2d 766 (Okla. 1989) (intentional infliction of emotional distress and invasion of privacy claims based on

continued denunciation of former member during church services actionable).

## Counseling Malpractice

■ We next address appellants' challenge to the trial court's malpractice instruction to the jury as legally erroneous and unsupported by the evidence. On appeal, "[j]ury instructions are viewed as a whole, with an eye toward determining whether or not the jury has been given the proper rules to apply in arriving at its decision." *Catchings v. City of Glendale*, 154 Ariz. 420, 424, 743 P.2d 400, 404 (App.1987). We will not overturn a verdict because of instructions that were given unless there is substantial doubt whether the jury was properly guided in its deliberations. *Id.*

■ Appellants maintain that appellees' malpractice claim was essentially a claim for clergy or pastoral malpractice and that the therapist malpractice instruction submitted to the jury ignored the reality of the parties' relations and thus was improperly given. In support of this argument, appellants cite several cases rejecting clergy malpractice claims because of First Amendment concerns about determining a standard of care.[1] Those cases are not applicable here because the claim submitted to the jury was for therapist malpractice, not clergy malpractice, and was based on a psychological therapist's duty not to disclose confidential information revealed in counseling sessions. *Dausch v. Rykse*, 52 F.3d 1425 (7th Cir.1994). Appellees' claim arose, not out of any duty Outlaw owed them in his capacity as their pastor, but rather out of his duty as a therapist or counselor to refrain from acting in a manner that carried a foreseeable and unreasonable risk of harm to the person being counseled. *See Dausch* (psychological malpractice claim upheld against minister acting as counselor); *Sanders v. Casa View Baptist Church*, 898 F.Supp. 1169 (N.D.Tex.1995) (professional malpractice claim upheld against pastor acting as marriage counselor).

■ Although we have found no Arizona cases in which the disclosure of confidential information by a counselor served as the basis of a malpractice claim, other jurisdictions have recognized causes of action arising from disclosures of confidences by providers of counseling services. *See Johnson v. Lincoln Christian College*, 150 Ill.App.3d 733, 103 Ill.Dec. 842, 501 N.E.2d 1380 (1986) (counselor); *Hope v. Landau*, 21 Mass.App. 240, 486 N.E.2d 89 (1985), *vacated on other grounds*, 398 Mass. 738, 500 N.E.2d 809 (1986) (psychologist); *Harley v. Druzba*, 169 A.D.2d 1001, 565 N.Y.S.2d 278 (1991) (social worker); *Watts v. Cumberland County Hospital System, Inc.*, 75 N.C.App. 1, 330 S.E.2d 242 (1985), *reversed in part on other grounds*, 317 N.C. 321, 345 S.E.2d 201 (1986) (marital and family therapist). Additionally, we note that counseling malpractice has been recognized generally by Division One of this court. *See L.A.R. v. Ludwig*, 170 Ariz. 24, 821 P.2d 291 (App.1991) (counselor may be subject to liability for negligence claim based on improper treatment and counseling).

Arizona has long acknowledged and protected the confidential nature of relationships between physicians and their patients, A.R.S. § 12–2235, and more recently between psychologists and other behavioral health providers and their clients, A.R.S. §§ 32–2085 and 32–3283, including counselors and "marriage therapists." A.R.S. §§ 32–3301 and 32–3311. The purpose behind these privileges is "to enhance the effective diagnoses and treatment of illness by insuring that a person requiring professional attention will not be deterred by fear that his physical or mental condition may become public, thereby subjecting him to embarrassment or humiliation." *Bain v. Superior Court in and for Maricopa County*, 148 Ariz. 331, 334 n. 1, 714 P.2d 824, 827 n. 1 (1986). *See also Jaffee v. Redmond*, —— U.S. ——, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (recognizing psychotherapist-patient privilege and extending it to counseling sessions with social worker).

■ Appellants point out that the privileges noted above apply only to *licensed* counselors and therapists, A.R.S. § 32–3283,

---

1. *Schmidt v. Bishop*, 779 F.Supp. 321 (S.D.N.Y. 1991); *Nally v. Grace Community Church of the Valley*, 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989); *Hester v. Barnett*, 723 S.W.2d 544 (Mo.App.1987).

and argue that Outlaw should not be held to the same standards. We find this argument flawed for two reasons. First, that Outlaw was not subject to Arizona's statutory scheme for establishing professional counseling standards and shielding client confidences from disclosure has no bearing on the question of whether he had a duty not to disclose the confidences at issue, particularly when no statutory violations were alleged in appellees' complaint or at trial.[2] Second, one who holds himself out and undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities. *Kreisman v. Thomas*, 12 Ariz.App. 215, 469 P.2d 107 (1970); Restatement (Second) of Torts § 299A (1965). At trial, appellees presented expert testimony that mental health therapists and counselors have a duty not to disclose confidential information, with certain limited exceptions, and that this duty applies to both pastoral and professional counselors, whether licensed or not.

In sum, appellants offer no good reason for insulating a counselor from liability for betraying clients' confidences to their detriment merely because the counselor is a clergy member and unlicensed, and the counseling as well as wrongful disclosure takes place in a religious setting.

■ Here, Rose testified that she was referred to Outlaw for counseling to help her through emotional difficulties and depression "because of his 40 years' counseling experience," that she made an appointment with him for that purpose, and that she met with him in his office at the Church. During Rose's first counseling session, Outlaw used a chart to determine her level of self-esteem and concluded it was very low and she needed to raise it. Outlaw also discussed ways for Rose to deal with her feelings of guilt about her relationship with Kirkland. The inclusion of biblical passages on the chart did not convert the session into religious counseling, especially when the purpose of the meeting was not to provide her with religious or spiritual guidance, the Church's precepts and practices were not part of the counseling, and Rose was not a Church member when she sought help from Outlaw.

As to Isaac, Rose referred him to Outlaw for help in dealing with his emotional reactions to his wife's infidelity. Prior to joining the Church, Isaac met with Outlaw at his Church office and they discussed how Isaac should cope with his wife's affair with his father. They continued to meet and subsequently discussed Isaac's retaliatory affair with a friend of his wife and Outlaw advised him on his marital relationship. Isaac testified that he considered these meetings to be for counseling and believed they were confidential.

Prior to their marriage, Naomi and Andrew went to Outlaw for premarital counseling. When difficulties arose in their marriage, they returned to Outlaw for marital counseling because of their previous counseling relationship and because he held himself out as a marriage counselor. After one session, Naomi met with Outlaw alone in the Church office and confided to him that she was unable to receive affection from her father because he had once "embraced her in an uncomfortable way." Outlaw diagnosed Naomi as having an "acute rejection complex." Naomi testified she believed Outlaw would keep confidential the information he learned in counseling her.

Outlaw subsequently divulged highly personal facts about all three Martinezes to his family members, threatened to make additional disclosures about Rose, and told a Church administrator that there were "incest problems" between the Martinezes and their father, all of which he had either learned or purportedly learned during one-on-one counseling sessions with Rose, Naomi, and Isaac. During his testimony, Outlaw conceded that he considered information learned in counseling sessions to be confidential and that confidentiality applies even when others know the information. Accordingly, we conclude that the evidence supported the giving of a counseling malpractice instruction.

---

2. In Arizona, mental health counselors are not required to be licensed and appellees' expert testified that he had previously practiced as an unlicensed counselor for ten years.

We find appellants' remaining arguments challenging jury instructions and the denial of their motions for directed verdicts on appellees' other claims involving breach of fiduciary duty, defamation, and invasion of privacy without merit. We need not specifically address any of those issues, however, because of our resolution of the malpractice issue and because the trial court did not permit appellees duplicate recoveries on any of their claims.

### Loss of Consortium

 Appellants' final contention is that James cannot recover damages for loss of consortium because Rose recovered only for emotional injuries and suffered no physical injuries. When one spouse is injured by tortious conduct, the other may bring an action for loss of consortium, which is defined as "a loss of capacity to exchange love, affection, society, companionship, comfort, care and moral support." *Pierce v. Casas Adobes Baptist Church*, 162 Ariz. 269, 272, 782 P.2d 1162, 1165 (1989). Appellees argue that loss of consortium claims can be based on non-physical injuries because "Arizona law recognizes that emotional injuries are to be compensated on a par with physical injuries," citing *Skousen v. Nidy*, 90 Ariz. 215, 367 P.2d 248 (1961), and *Reed v. Real Detective Publishing Co.*, 63 Ariz. 294, 162 P.2d 133 (1945). This may be a correct statement of law, but those cases are inapplicable here because they involved direct claims for emotional injuries to the plaintiffs, while loss of consortium is a derivative claim. *See Villareal v. State Department of Transportation*, 160 Ariz. 474, 774 P.2d 213 (1989).

 We find no Arizona authority permitting one spouse to recover for loss of consortium in the absence of physical injury to the other spouse. Both sides urge us to follow case law from other jurisdictions supporting their respective positions. However, the Restatement (Second) of Torts § 693 (1977), in defining loss of consortium, requires the underlying injury to be physical:

> One who by reason of his tortious conduct is liable to one spouse for *illness or other bodily harm* is subject to liability to the other spouse for the resulting loss of the society and services of the first spouse. . . .

(Emphasis added.) As a general rule, in the absence of law to the contrary, Arizona follows the Restatement. *Webster v. Culbertson*, 158 Ariz. 159, 761 P.2d 1063 (1988); *Jesik v. Maricopa County Community College District*, 125 Ariz. 543, 611 P.2d 547 (1980). We agree with appellants that this is not the case to expand Arizona law by allowing a spouse essentially to recover for emotional distress resulting from the other spouse's emotional distress. Consequently, we vacate the judgment in favor of James on his loss of consortium claim.

### Disposition

The trial court's judgments in favor of Rose, Naomi, and Isaac are affirmed. The judgment for James is vacated. Rose, Naomi, and Isaac are entitled to their costs on appeal upon compliance with Ariz. R. Civ. App. P. 21(a), 17B A.R.S.

DRUKE, C.J., and TOCI, J., concur.