NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

In re the Matter of:
GLASS & GARDEN DRIVE-IN CHURCH

---

GLASS & GARDEN DRIVE-IN CHURCH; DAVID NOKES;
MARK REEGA; RICK BLACK; and JACOB NEVZOROFF,
*Petitioners/Appellants,*

*v.*

CLASSIS OF THE SOUTHWEST, R.C.A.,
*Respondent/Appellee.*

No. 1 CA-CV 14-0525
FILED 1-19-2016

---

Appeal from the Superior Court in Maricopa County
No. CV2013-015209
The Honorable J. Richard Gama, Judge

**AFFIRMED**

---

COUNSEL

Joseph W. Charles, P.C., Glendale
By Joseph W. Charles
*Counsel for Petitioners/Appellants*

Lewis Roca Rothgerber Christie LLP, Phoenix
By Robert G. Shaffer, Amanda L. Thatcher
*Counsel for Respondent/Appellee*

_____

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Jon W. Thompson and Judge Lawrence F. Winthrop joined.

_____

**H O W E**, Judge:

¶1 David Nokes, Mark Reega, Rick Black, Jacob Navzoroff, and the Glass & Garden Drive-In Church appeal the trial court's order granting the Classis of the Southwest, Reformed Church in America's (the "Classis") motion to dismiss for lack of subject matter jurisdiction. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**1. The Reformed Church in America**

¶2 The Reformed Church in America ("RCA") "minister[s] to the total life of all people by preaching, teaching, and proclamation of the gospel of Jesus, Christ, the Son of God, and by all Christian good works." The religious organization is governed by its own constitution and the Book of Church Order ("BCO"), which contains the RCA's government structure, disciplinary and judicial procedures, bylaws and special rules of order of the General Synod, and formularies. The RCA is composed of a hierarchical structure of tribunals which consist of, in ascending order: (1) the consistory, a local church's governing body; (2) the classis, an assembly and judicatory body superintending local churches in a designated area; (3) the regional synod, an assembly and judicatory body superintending groups of designated regional classes; and (4) the General Synod, the RCA's highest assembly and judicatory body. The RCA's governing bodies "exercise judicial as well as legislative powers," and "[t]he governmental functioning of these offices takes place, not apart from, but in harmony with the understanding of the mission of the church and the nature of its ministry."

¶3 Article 7 of the BCO provides the RCA with a process, known as "supersession," by which it may remove a local church's consistory and install new leadership: "The classis shall have the authority to supersede a consistory in the administration of a local church, when, in its judgment, there are conditions in that church which make it unable to fulfill the functions of a local church . . . ." Article 7, section 12, subsection j identifies

one of these conditions: the "consistory requests supersession." The act of supersession "shall dissolve the consistory and otherwise terminate the formal organization of that church and [the classis shall] take such steps as may be necessary to bring that church, its ministry, and its property under the direct administration of the classis."

¶4        Before superseding a consistory, however, the classis "shall notify the church of its intention and summon the governing body to show cause why that consistory should not be dissolved and the church and its property be administered under the direction and supervision of the classis." But if the basis for supersession is by request, the consistory "need not show why it should not be dissolved and may, instead, advise the classis of its approval of this action." The classis's notice shall provide, among other things, that the local "church shall not have a consistory, but the classis shall designate those persons, not necessarily members of that church, who shall exercise the functions of a consistory . . . ." Moreover, "[t]hese persons shall serve the church in the same capacity as a consistory until such time as the life of the church has reached an end or a consistory for the church is reconstituted." After superseding a consistory, the classis "shall have the authority" to take "the church under its direction by appointing such trustees as are required for the protection, preservation, management and ownership of the property during such time as the classis shall determine."

¶5        Under the BCO, a consistory or one of its members may challenge the classis's supersession decision by filing a complaint against the classis, alleging that the classis's decision violated or failed to comply with the RCA's constitution or other laws and regulations of the church. After the lower judicatory body renders a judgment, the consistory or one of its members may then appeal the judgment by filing a notice of appeal and transferring the complaint to the next higher judicatory body. The regional synod is the final court of appeal for all cases originally heard by a board of elders, but the General Synod may hear a case if one delegate from each regional synod provides written notice that "just cause" exists for appealing the case to the General Synod.

## 2. The Glass & Garden Drive-In Church

¶6        Under the RCA's constitution and BCO, local churches are an integral and subordinate part of the larger church. They "together delegate authority to classes and synods, and having done so, they also bind themselves to be subject together to these larger bodies in all matters in which the common interests of the many churches are objects of concern."

The Glass & Garden Drive-In Church ("the Garden") is a local church founded "for the primary object of carrying out the purposes and principles of the Reformed Church in America." The Garden's primary purpose is to create a church "wherein the members shall worship and labor together according to discipline, rules and usages of the [RCA] as from time to time authorized and declared by the General Synod of said [RCA]."

¶7        The Garden's "Consistory Bylaws" from as recently as 2011 have provided that the church "is affiliated with the Reformed Church in America" and "[i]n keeping with RCA policy, the name of the governing board of The Garden is the 'Consistory.'" Moreover, the Garden's "consistory will operate with the following rules of order and in keeping with the Constitution of the RCA and the Book of Church Order (BCO) as published yearly by the RCA." The consistory's general responsibilities include, but are not limited, to: (1) governing "the spiritual and business affairs of the congregation in accordance with the constitution"; (2) serving "as trustees of the church property in accordance with the constitution"; and (3) promoting "the work and welfare of the church as a member of the Classis of the Southwest, and the RCA."

### 3. The Garden's Request for Supersession

¶8        In 2013, Mr. Nokes, a member of the Garden's consistory and on behalf of the consistory, sent a letter to the Classis, requesting supersession pursuant to the BCO:

> Yesterday, June 2, 2013, the Consistory of the Garden Church, in a special meeting and in accordance with Article 7 Section 12 paragraph j of the Reformed Church in America Book of Church Order, voted unanimously to request supersession from the Classis.
>
> Pastors Jim Poit, Gary Jarvis, and Mr. Wayne Ribbens were in attendance, and are informed of this decision, along with pastors Gene James, Larry Brasen, Kim Hicks, Cassie Peters and David Nokes, who comprise of the Garden Consistory.

¶9        In accordance with the BCO, the Classis held a meeting "to acknowledge receipt of correspondence received from [the Garden's] Consistory and take action as appropriate." The Classis asked for comments from the Garden's representatives, and then-Pastor Gene James commented on the circumstances leading to the Garden's request. Afterwards, the Classis recommended, "consistent with the [RCA BCO] Chapter 1, Part 2, Section 12, para J, that the Classis of the Southwest honor

4

the request from [the Garden] for Supersession." The Classis voted unanimously to grant the Garden's request and select persons to serve as the Garden's trustees and "be designated to exercise the functions of [the Garden's] consistory," "consistent with the [RCA BCO] Chapter 1, Part 2, Section 13, para d, and Chapter 1 Part 2 Section 14, para, a & b."

¶10        Soon after, Pastor James announced in a letter to the Garden's membership that he was leaving and provided the background for the supersession request. Pastor James explained that over the last few years, the Garden had made "numerous attempts to increase the attendance," but "[d]espite [their] efforts . . . , many came and many left," and the "[o]ngoing financial deficits resulted in [the] church asking the Classis to supersede." He stated that a sister church had "underwent supersession recently and after they closed the church, another church leased the property and within one year they had to expand to 2 services to accommodate their growth and they have since purchased the property." The pastor was "encouraged by that result" and did "not want to stand in the way of a similar result here at [their] church. [Their] property [was] much too big and costly for [their] current numbers." Mr. Nokes left the Garden around the same time that Pastor James did.

¶11        In late October, the Classis appointed Classis members to the Garden's trustees' board and filed a notice of officer change for the Garden with the Secretary of State. After Mr. Nokes was locked out of the Garden, his attorney sent the Classis a letter, stating that a Classis member "absconded with Mr. Nokes' private financial records and made inquiries which insinuated wrongdoing on the part of Mr. Nokes." Mr. Nokes demanded $150,000 in compensation, in light of his "continued assistance to the RCA, which resulted in the contribution, of, literally, millions of dollars to the classis retirement fund." The Classis rejected the demand.

### 4. The Litigation Regarding the Garden

¶12        Mr. Nokes and former members of the Garden who had left the church before Mr. Nokes, Mark Reega, Rick Black, and Jacob Navzoroff (collectively, "Petitioners") sued the Classis in their individual capacities and on behalf of the Garden. Petitioners requested that the trial court appoint them as the Garden's directors pursuant to the church's articles of incorporation and A.R.S. § 10–3160, which provides for judicial relief in matters relating to corporations. They also alleged that the Garden had "suspended" the BCO in 2007 and had been "operat[ing] outside the authority of the classis." The Classis moved to dismiss the complaint, arguing that the court lacked subject matter jurisdiction to decide the

church governance dispute under the "ecclesiastical abstention" doctrine. The Classis argued alternatively that if the court had jurisdiction, the court could not grant the requested relief under A.R.S. § 10–3160 because (1) Petitioners did not have standing because they were not the Garden's directors and (2) the Garden's affairs were governed by religious doctrine, which the statute recognized as the controlling authority.

¶13 Petitioners then amended their complaint to add claims of injunctive and declaratory relief and conversion, alleging that the Classis improperly took the Garden's assets and property and requested return of all property. The assets and property "titled" to the Garden included the building, a van, bank accounts, corporate records, and "other church records including the baptismal and marriage information of the [Garden's] congregants." Petitioners then attempted to amend their complaint to add ejection and quiet title claims. The Classis objected to Petitioners' second amended complaint, arguing that the amendments were futile because (1) Petitioners were not the Garden's directors and therefore had no authority to bring an action on its behalf and (2) defects in a court's subject matter jurisdiction could not be cured.

¶14 At oral argument on the motion to dismiss, the trial court acknowledged Petitioners' second amended complaint, but agreed with the Classis that any amendment was futile. The court then granted the motion to dismiss pursuant to Arizona Rule of Civil Procedure 12(b)(1), concluding that the ecclesiastical abstention doctrine deprived it of subject matter jurisdiction and that it had no authority to appoint or install new church leadership. The court found "for constitutional purposes, that the RCA [was] a hierarchical church and further that its governance, including the supersession process, [was] an ecclesiastical matter." It also found that "as a local RCA affiliated church, [the Garden] [was] subject to its ecclesiastical law." Thus, the court "decline[d] to exercise secular jurisdiction over the on-going supersession process and [would] defer to this hierarchical church's decision on this ecclesiastical governance issue." Petitioners timely appealed.

## DISCUSSION

¶15 Petitioners argue that the trial court erred in granting the Classis's motion to dismiss pursuant to Rule 12(b)(1). They contend that the ecclesiastical abstention doctrine does not apply because Arizona has adopted the "neutral principles of law" doctrine, which allows the trial court to address the subject matter in this case. We review de novo orders dismissing cases for lack of subject matter jurisdiction. *State ex rel.*

6

*Montgomery v. Mathis*, 231 Ariz. 103, 109 ¶ 18, 290 P.3d 1226, 1232 (App. 2012). Subject matter jurisdiction "refers to a court's statutory or constitutional power to hear and determine a particular type of case." *State v. Maldonado*, 223 Ariz. 309, 311 ¶ 14, 223 P.3d 653, 655 (2010). "In resolving a subject matter jurisdiction challenge, the trial court may take evidence and resolve factual disputes essential to its disposition of the motion without converting the motion into one for summary judgment." *Church of Isaiah 58 Project of Ariz., Inc. v. Laz Paz Cty.*, 233 Ariz. 460, 463 ¶ 9, 314 P.3d 806, 809 (App. 2013). The existence of a factual dispute does not require denying the motion. *Gatecliff v. Great Republic Life Ins. Co.*, 154 Ariz. 502, 506, 744 P.2d 29, 33 (App. 1987). Because the ecclesiastical abstention doctrine divests the court of subject matter jurisdiction, the trial court did not err in granting the Classis's motion to dismiss pursuant to Rule 12(b)(1).

¶16        The ecclesiastical abstention doctrine is embedded in the free exercise and establishment clauses of the First Amendment to the United States Constitution, *Serbian E. Orthodox Diocese for U.S.A. & Can. v. Milivojevich*, 426 U.S. 696, 708–09 (1976), which applies to the states by its incorporation into the due process clause of the Fourteenth Amendment, *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 876–77 (1990). These amendments permit "religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." *Milivojevich*, 426 U.S. at 724. As a result, civil courts cannot "inquire into internal organizational disputes between different factions of a religious organization or into property disputes that would require interpreting religious doctrine or practice." *Rashedi v. Gen. Bd. of Church of the Nazarene*, 203 Ariz. 320, 323–24 ¶ 14, 54 P.3d 349, 352–53 (App. 2002). Rather, they "must accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Id.* at 324 ¶ 15, 54 P.3d at 353; *see also Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) ("[*Watson v. Jones*, 80 U.S. 679 (1871), establishes that the ecclesiastical abstention doctrine] radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.").

¶17        Arizona's ecclesiastical abstention doctrine provides even broader protection: the doctrine precludes civil courts from inquiring into "ecclesiastical matters," regardless whether the church is hierarchical or

congregational and whether the dispute has been addressed by an adjudicatory body within the church. *See Ad Hoc Comm. of Parishioners of Our Lady of Sun Catholic Church, Inc. v. Reiss*, 223 Ariz. 505, 512 ¶ 18, 224 P.3d 1002, 1009 (App. 2010); *Rashedi*, 203 Ariz. at 323 ¶ 14, 54 P.3d at 352. "Ecclesiastical matters" include those that concern "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Reiss*, 223 Ariz. at 511–12 ¶ 16, 224 P.3d at 1008–09. Thus, "[i]f the subject matter of [a party's] dispute is ecclesiastical, we lack jurisdiction to resolve those claims." *Id.* at 512 ¶ 18, 224 P.3d at 1009. A court that lacks subject matter jurisdiction cannot adjudicate the action. *Maldonado*, 223 Ariz. at 311 ¶ 14, 223 P.3d at 655. The court must therefore dismiss the action, and all other motions are deemed moot. *See Reiss*, 223 Ariz. at 510 ¶ 10, 224 P.3d at 1007.

¶18 Here, Petitioners alleged in their first amended complaint that "the classis through an ecclesiastical procedure known as 'supersession' attempted to not only dissolve the [Garden] corporate form, but also sought to seize real and personal property titled and possessed by the [Garden]." Thus, Petitioners requested judicial appointment as the Garden's directors; injunctive relief to prevent the Classis "from continuing any confiscation of any property rightfully belonging" to the Garden and commanding that the Classis return all the Garden's property; declaratory relief that all the property "seized" by the Classis belongs to the Garden; and damages for the Garden's property previously converted and continuing to be converted. We decline to address these counts, however, because the core issue in all of them involve internal organizational disputes between Petitioners and the Classis, specifically involving the Garden's consistory's on-going supersession process, and resolution of this issue would require the court to inquire into the church's ecclesiastical governance and to interpret religious doctrine and practice.

¶19 The Garden's formation and the procedures undertaken by its consistory to request supersession demonstrate how the core issue here is purely an "ecclesiastical matter" concerning the church's governance. First, the Garden was formed to carry out the RCA's purposes and principles, and under the RCA hierarchy, the Garden's consistory—its governing body—is subject to the RCA's constitution and BCO. Correspondingly, the Garden's articles of incorporation and bylaws recognize the local church's existence as a subordinate part of the RCA religious organization, and both documents provide that the church would operate consistently with the RCA's constitution and BCO. Further, by doing so, the Garden's consistory subjected itself to the constitution and BCO, including the BCO provision

providing that the Classis may remove the Garden's consistory through the supersession process. Thus, the reorganization of any local church's consistory under the BCO—including the Garden's consistory's reorganization through the supersession process—involves a matter of internal church governance, "an issue at the core of ecclesiastical affairs." *Milivojevich*, 426 U.S. at 721–22 ("[R]eligious freedom encompasses the power of religious bodies to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.") (internal quotation marks and parentheses omitted).

¶20 Second, contrary to Petitioners' claim that the Garden's consistory had suspended the BCO in 2007, its consistory turned to the Classis in 2011 when the Garden was facing difficulty. Mr. Nokes wrote a letter to the Classis and requested supersession pursuant to "Article 7 Section 12 paragraph j of the Reformed Church in America Book of Church Order." Following the procedures the BCO dictated, the Classis notified the local church's members and held a meeting to discuss receipt of its request for supersession and asked for an explanation from the Garden's consistory. At that meeting, the Classis heard comments from the Garden's consistory and discussed the supersession request with them. Only after reaching an agreement with the Garden's consistory for supersession did the Classis voted to accept the consistory's request. In further accordance with the BCO, the Classis later appointed persons to serve as the Garden's trustees to exercise the functions of the Garden's consistory.

¶21 Petitioners counter that the issue here centers on a property dispute, not on inter-governmental affairs, and can be resolved by resorting to the "neutral principles of law" doctrine, which would not run afoul of the First Amendment. The United States Supreme Court has recognized that "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Jones v. Wolf*, 443 U.S. 595, 604 (1979). Depending on the circumstances, "civil courts can resolve at least some church-related disputes through neutral principles of law so long as the case is resolved" without inquiry into religious doctrine or internal organizational disputes. *Reiss*, 223 Ariz. at 512–13 ¶¶ 19–20, 224 P.3d at 1009–10. But the First Amendment "commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine." *Presbyterian Church in U.S. v. Mary Elizabeth Bull Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).

¶22 Here, the neutral principles doctrine does not apply because resolution of this case requires the court to resolve questions of

ecclesiastical governance and religious doctrine and practice. Petitioners' characterization of the core issue as one of property simply does not transform this case into a church property dispute under the neutral principles doctrine. *See Milivojevich*, 426 U.S. at 707–09 (rejecting neutral principles doctrine when plaintiff sought "to have himself declared [the church's] Bishop"; "this case essentially involves not a property dispute but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil tribunals"). Contrary to Petitioners' claim that the Classis confiscated the Garden's property and dissolved the corporate entity, the record shows that the Garden's current trustees are exercising the functions of the Garden's consistory and the Garden, the corporate entity, continues to hold its assets and property, including the building.

¶23        Indeed, resolution of the religious dispute here affects both the control of the Garden's property and its administration because the Garden's directors, who are members of its consistory, control the Garden, which is the property-holding corporation. Therefore, this case essentially involves not a church property dispute, but a religious dispute the resolution of which under our cases is for ecclesiastical and not civil courts. *See Rashedi*, 203 Ariz. at 323–24, 54 P.3d at 352–53 ("Nor can civil courts inquire into internal organizational disputes between different factions of a religious organization or into property disputes that would require interpreting religious doctrine or practice."); *Dobrota v. Free Serbian Orthodox Church St. Nicholas*, 191 Ariz. 120, 124 ¶¶ 13–14, 952 P.2d 1190, 1194 (App. 1998) (providing that civil courts must abstain from deciding disputes about any "essential part of church government").

¶24        To support its argument, Petitioners urge us to adopt the conclusion in *Masterson v. Diocese of Northwest Texas*, 422 S.W.3d 594, 608 (Tex. 2014), a case holding that under the neutral principles doctrine, the trial court had jurisdiction to determine who owned a local church property in dispute between the hierarchical church organization and former parishioners because the dispute did not involve ecclesiastical matters of church governance and the decision could be based on neutral principles. But that case is distinguishable mainly because the dispute there involved property *ownership*. *See id.* ("We agree with the court of appeals that the record conclusively shows TEC is a hierarchical organization. . . . [But] we disagree with its determination that the question of who *owns the property* is inextricably linked to or determined by them.") (emphasis added); *see also id.* at 603 ("Under the neutral principles methodology, *ownership* of disputed property is determined by applying generally applicable law and legal principles.") (emphasis added). But here, as mentioned, the *ownership* of the Garden's assets and property is not in dispute, but rather, who

controls the Garden and in turn controls its assets and property. The Garden's control is undoubtedly an ecclesiastical matter of church governance subject to the RCA's constitution and BCO.

¶25      Consequently, because the ecclesiastical abstention doctrine divests the court of subject matter jurisdiction, the trial court did not err in granting the Classis's motion to dismiss pursuant to Rule 12(b)(1). Accordingly, all other issues, including whether the trial court erred in not appointing Petitioners the Garden's directors under A.R.S. § 10–3160 and whether Petitioners had standing to act on behalf of the Garden as they were not its directors, are moot. *See Reiss*, 223 Ariz. at 510 ¶ 10, 224 P.3d at 1007 (providing that standing issues were moot because the ecclesiastical abstention doctrine divested the court of jurisdiction); *Maldonado*, 223 Ariz. at 311 ¶ 14, 223 P.3d at 655 (providing that a court that lacks subject matter jurisdiction cannot adjudicate the action); *State v. Fimbres*, 222 Ariz. 293, 302 ¶ 14, 213 P.3d 1020, 1029 (App. 2009) ("[D]efects in subject matter jurisdiction cannot be cured).

## CONCLUSION

¶26      For the foregoing reasons, we affirm. We also award the Classis its taxable costs upon compliance with Arizona Rule of Civil Appellate Procedure 21.

